# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-18-00381-CR

---

**Crispin James Harmel, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 368TH DISTRICT COURT OF WILLIAMSON COUNTY
### NO. 13-0826-K277, THE HONORABLE RICK J. KENNON, JUDGE PRESIDING

---

## O P I N I O N

Crispin James Harmel was convicted by a jury of capital murder for intentionally killing Jessika Kalaher in the course of committing or attempting to commit kidnapping, robbery, or aggravated sexual assault. *See* Tex. Penal Code § 19.03(a)(2). The trial court entered judgment on the jury's verdict and assessed Harmel's punishment at imprisonment for life, without parole, in the Texas Department of Criminal Justice. *See id.* §§ 12.31(a)(2), 19.03(b).

In four issues, Harmel contends (1) that the evidence was insufficient to support the jury's findings that he intentionally caused Kalaher's death, (2) that the jury charge should have included abstract definitions of the intentional and knowing mental states, (3) that the charge should have included limiting instructions under Rule of Evidence 404(b) and about the burden of proof applicable to extraneous acts, and (4) that the trial court abused its discretion by admitting evidence obtained by allegedly invalid search warrants. We affirm.

## BACKGROUND

The day before Labor Day 2009, Jessika Kalaher spent the day socializing with her cousin and best friend, Melanie Lopez-Kilpatrick, and other mutual friends. The group went swimming and barbecued. Kalaher wore a bathing suit and a white, terry-cloth cover-up. The cover-up had a cloth tie string, which Kalaher would normally wear tied in a bow.

The group stayed at the pool for several hours then went to a restaurant. Lopez-Kilpatrick bought Kalaher's drink for her because Kalaher had so little money. Also, Lopez-Kilpatrick's brother would help Kalaher with money from time to time.

After the restaurant closed, the group went to a bar and played pool. Kalaher had only one drink because she had to work the next morning. After midnight, the group left the bar, and Kalaher dropped the friends off in her car. Lopez-Kilpatrick invited Kalaher to stay with her overnight, but Kalaher refused because "she needed to get to work in the morning." She told Lopez-Kilpatrick that she would go home, stopping to buy dog food on the way.

Kalaher stopped at a Walmart near the intersection of U.S. Highway 183 and Walton Way in Cedar Park. Walmart video recordings introduced in evidence show her buying dog food at around 1:44 a.m. She then left the store with the bag of dog food and got into her white Kia in the parking lot. The recordings also show a man—later determined to be Harmel—walk out of the store shortly after she did, approach the driver side of the Kia, and get in on that side rather than on the passenger side. The recordings show both Kalaher and Harmel in the store and then walking outside, but they do not show the two ever interacting or even acknowledging each other before he got in the car. Kalaher's behavior when she arrived at the Walmart suggested that she was not there to meet anyone.

2

Detective Larry Bond of the Cedar Park Police Department described Kalaher, as she was shown on the recordings: she "pulled in, and her white Kia parked, and now she is walking from her car to these grocery doors" without "appear[ing] to be looking around as if she's about to meet somebody." She did not "appear to be looking around, trying to find her suitor," unlike Harmel's later suggestion to investigators that Kalaher was at the Walmart to meet him for sex. She was, Detective Bond testified, "just carrying a large bag of dog food." Harmel is shown getting into the Kia on the driver side after Kalaher at around 1:46 a.m., and the Kia left the parking lot at around 1:47 a.m.

Other recordings show Kalaher's Kia enter a nearby pizza store's parking lot at around 2:53 a.m. The Kia is shown stopping in a parking spot, its lights turn off, and then a figure is seen exiting the driver side and moving through the parking lot toward a red or maroon truck.

After dawn, two employees of the pizza store arrived for work. One arrived at around 9:00 a.m., and the Kia was in his parking spot. He saw Kalaher in the Kia trying to crawl from the back seat to the front and heard the horn honk in the process. When the second employee arrived, about half an hour later, she saw Kalaher in the Kia naked and "climbing out of the back to get dressed in the front seat." Her movements were not "smooth" or "fluent"; they were "jerky" and "uncoordinated."

The male employee next saw Kalaher mid-morning. She was standing outside the Kia's driver door, bent over, looking in the car for something. Later, he saw her walk across the parking lot while holding her hands up to her ears like she was talking on a phone. The female employee looked out the pizza store's window and saw Kalaher standing outside the Kia's driver door. She was "messing with her hair" and "trying to put herself together." "She was

3

very skittish" and "acting like everything scared her." This made the employee think that Kalaher was "on something." Still later, the employee took a smoking break outside and saw Kalaher again. This time she was talking to herself in the Kia.

Around noon the female employee again saw Kalaher in the Kia, with "her right pointer finger on the steering wheel—or almost touching the steering wheel, and she was making the figure-8 motion" and "swaying back and forth, kind of like Stevie Wonder does," "still talking and singing" and "soothing herself." Hours later, the male employee noticed Kalaher in the Kia again. She was dead. He saw "bruising around her neck, on her face, and on her legs."

Officers from the Cedar Park Police Department arrived to investigate. When approaching the Kia, they noticed "a strong smell, a pungent smell." Kalaher was dead, partially undressed and wearing only her swimsuit cover-up around her midsection. The tie string from the cover-up was missing. There were feces on her legs, in the front seat, on the rear passenger door, on a sunshade in the back seat, on the center console, on the back seat's floorboards, and on items on the back seat's floor. The interior otherwise was "very messy" and in "disarray." The officers could not find the keys. Her body appeared "beat up pretty bad."

Detective Bond later reviewed photos, entered into evidence at trial, that law enforcement took of the Kia while Kalaher's body was in it. He noted that the driver seat was pushed far backwards from the steering wheel, suggesting that Kalaher could not reach the pedals.

He also saw ligature marks on Kalaher's shoulder and neck, including a "horizontal ligature mark around the front of her throat" and "scratches and fingernail marks underneath her chin." He considered these injuries "suspicious and odd." He also learned that, as of the day she died, Kalaher had a negative balance in her banking account of about $158.

4

After law enforcement issued a media release for help identifying the man and the truck, several tips named Harmel as the truck's owner.

Detective Bond met Harmel at Harmel's parents' house and saw that Harmel's truck had been altered. He testified that "[t]he large silver chrome piece across the tailgate . . . was no longer there," "some of the side molding along the bottom portion of the driver's door area . . . was also gone," "some silver chrome pieces" that "clip[] onto the wheel on those Chevrolet models were no longer there," "the silver color of the actual metal rim had been painted black," and "the wheels [we]re no longer silver."

Harmel would later permit law enforcement another chance to inspect his truck. During that inspection, they found "black spray paint that was sprayed on" the back of the truck, where the color had originally been silver. The truck's back silver plate, which would usually say "Chevrolet" across it, had been removed altogether, and there was another attempted spray-painting on the silver back bumper. One tire rim was "completely covered with black spray paint," and two others were spray-painted but not completely so. The "black and silver strip" on the driver door was removed.

During the detectives' interview with him, Harmel said that Kalaher and he planned on a sex website to meet at the Walmart on the night in question. He said that they left together in her car and went to a park. On the way, he said, they stopped at an ATM "because . . . [Kalaher] needed to withdraw $20." Later, however, Harmel said that she withdrew the $20 for him. Harmel inconsistently told the detectives that, when they returned from the park, he was in the Kia's front passenger seat or that he was in the back seat.

5

Harmel described the end of his encounter with Kalaher. He said that, as he was leaving the Kia in the pizza store's parking lot, he saw the car's headlights turn on. But the video recordings show that, once the Kia parked, its headlights never came back on.

Harmel also claimed that Kalaher had given him her debit card because he needed money for gas. He said that he was supposed to find her around noon the next day at a nearby grocery store to return her card. He said that he drove up and down the grocery store's parking lot in his truck looking for her. The store had video of the parking lot from the relevant time of day, but the video did not show Harmel or his truck.

After skipping a subsequent scheduled interview to "play[] softball," Harmel appeared for a second interview. In it, Detective Bond remarked to Harmel about Kalaher's driver seat being pushed back and asked him whether she was able to reach the pedals. Harmel responded, "I don't even want to think about it; it's gross." But, at that point, law enforcement had not shared any of the details of the car interior's condition with Harmel.

Harmel also gave conflicting statements about the time of the encounter and his activities after he left Kalaher. In the first interview, he said that he went to his friend Leslie Garcia's house and waited for her and her then-fiancé to arrive but that they did not show up. But in the second interview, he said that he went in their house, took a shower, sat on their couch, watched TV, talked about knee surgery with them, and left some clothes at their house. Garcia testified that she was a very close friend to Harmel but that, on the day in question, he did not come to her house at all. Harmel also told Detective Bond the purported screen name that Kalaher had used on the sex website; however, that screen name was active on the website six months after Kalaher's death.

6

After news of her death spread, Harmel talked with a friend who had briefly dated Kalaher. A few days after Kalaher was found, the friend "confront[ed]" Harmel. He was angry and wanted to know "what happened." Harmel told him that he and Kalaher had simply been "catching up" for about a half hour in the Walmart parking lot before he went inside. Harmel also told the friend that Kalaher "was fine" when he left her, "that he didn't do anything," and that he "didn't hurt her." Harmel also talked with another friend about why the police contacted Harmel. He told her that he was the last person to see Kalaher alive but that police had cleared him.

Detective Feliciano Acevedo, who specializes in forensic computer evidence, analyzed cellphones recovered from Harmel. He searched for Kalaher's name on one of the phones, and it returned only one hit. It was from the day after Kalaher died. It was a search of "weareaustin.com," which belongs to "a local news organization."

A forensic search of Kalaher's laptop and flash drive, the memory card from her phone, and a laptop that she shared with her cousin revealed no connections between Kalaher and Harmel, including no indication that Harmel's phones ever interacted with Kalaher's, or her computers, or that she had ever visited any of the sex websites over which Harmel, as he told investigators, arranged their meeting. Similarly, an examination of Harmel's phones revealed no connection with Kalaher from any time before the day of her death.

Dr. David Dolinak conducted the autopsy. He testified that the external injuries that he believed were relevant to Kalaher's cause of death were "a ligature mark or a scrape that went across the front of her neck from one side to another" and "small hemorrhages"—called "petechiae"—"on her eyes, around her eyes, . . . on her face and upper neck," and on her eyelids.

7

He thought the neck mark "suspicious." He testified that it was likely caused by a ligature made of a soft material like cloth, rather than something harder like piano wire, because there were "little abrasions coming off the side of" the mark, giving it a "ragged look."

Dr. Dolinak testified that petechiae appear when "tiny blood vessels . . . have ruptured, leaving these pinpoint dots in the skin." Petechiae are "caused usually by neck compression," such as strangulation. He said further: "[S]he was strangled once. She also has other neck injuries." Later in his testimony, he admitted the possibility that there were two manners of strangulation. He explained that "the bruising of the chin" could have resulted from "somebody else's hands, fingers, were up under her chin pressing and squeezing and creating injury—a type of manual strangulation" distinct from the ligature mark elsewhere across the neck. The chin marks also suggested either (1) that somebody "gripped and pulled up" her neck; (2) that she "might have been pressing her chin down to try and remove whatever" "ligature or hands" were there, "if she wasn't able to reach it with her hands"; or (3) that she was trying to pull off "a ligature around her neck" and "might have bruised the undersurface of her chin and jaw at that point."

Dr. Dolinak saw other "signs of trauma to the body." These included "bruises under her chin, on her upper chest, on her upper extremities and lower extremities, and on her back. There were a lot of scattered bruises." The body had scrapes or abrasions on "the front of her neck," "over her left shoulder," and "on one of her feet." The shoulder abrasion was "consistent with being restrained with a seat belt." She also "had a small bruise at the tip of her tongue," probably either because "she bit her tongue" or because "the force of somebody pushing up on her—on her chin and forc[ed] her tongue . . . between her teeth."

8

Dr. Dolinak saw evidence of defensive wounds in response to an assault. Her body had bruises on the back of her right hand, on the side of her left upper arm, in the inside of her left elbow, and on her left forearm. During his internal examination of the body, Dr. Dolinak observed other injuries consistent with strangulation, including hemorrhage over her voicebox, torn hyoid bones, and more extensive petechiae. He also saw evidence that Kalaher "suffer[ed] brain damage." Her unusual or disoriented behavior, as described by the employees of the pizza store, was "most likely caused by a combination of factors," including "low blood flow and, hence, oxygenation of the brain during a strangulation event" and "the mental shock of going through an episode of assault."

Dr. Dolinak concluded that Kalaher's "injuries were reflective of strangulation." He thought that "the strangulation and evidence of assault, characterized by the bruises and such, it looked like something, you know, really bad had happened to her." He testified that her cause of death was as a result of or a complication of "strangulation/assault." He also opined that, "but for the strangulation and assault, the death would not have occurred." And he testified that her manner of death was homicide and was not "suicide, accident, natural death, [or] undetermined."

Dr. Bill Smock, a doctor of forensic medicine and a peace officer, explained to the jury the sequence of events for someone being strangled:

> You go unconscious first, and that's because your brain isn't getting enough oxygenated blood. Then you may have a seizure. Then, at a minimum of 15 seconds, . . . your brain cells are dying, and things begin to happen. The first thing is you lose control of your bladder. Then, at a minimum of 30 seconds, you lose control of your rectal sphincter, and you poop yourself. And then somewhere between one minute and two and a half minutes you stop breathing. So there is a very short timeline of how long it takes to kill the cells in your brain for you to die.
>
> Now, depending on what part of our brain dies depends on what we're going to manifest; what are we going to exhibit. The last part of our brain to die is our

9

brain stem, the part that controls our breathing and our heartbeat. But above that
in the brain are things like personality and memory.

Dr. Smock said that this sequence of brain cells dying, plus heatstroke, accounted for Kalaher's abnormal behavior when the employees saw her on the day she died. He testified that she suffered "brain injury from not getting enough oxygen when pressure was applied to her neck," causing brain cells to die.

After reviewing the autopsy, Dr. Smock generally agreed with Dr. Dolinak's findings. He agreed on both the cause of death and manner of death—that Kalaher "[d]ied as a result of an assault and strangulation" and that her death was a "homicide."

Dr. Smock noticed injuries on her neck "consistent with . . . [her] fingernails," as if she was clawing at the ligature being held against her neck.[1] He also suggested that the ligature mark on her neck was one of "two areas where pressure was applied to her neck. There is a third mark on her shoulder." Referring to a demonstrative cloth tie like the one Kalaher's cover-up had, Dr. Smock testified that the marks on her neck fit with a cloth tie used as a ligature to strangle her. The second neck mark was in a different place from the ligature mark and was "most consistent with . . . fingers, thumb, and forefinger squeezing versus the other type[, which] would be a ligature." Given the two marks, Dr. Smock could "clearly see two distinct types of strangulation." He considered the resulting injuries "intentionally inflicted injuries." And he opined that Kalaher would not have died but for the two strangling methods.

The jury found Harmel guilty of capital murder for intentionally causing Kalaher's death by "choking, strangling or by impeding the normal breathing or circulation of

---

[1] Another forensic scientist had analyzed samples taken from underneath Kalaher's fingernails. The samples contained material consistent with her own DNA profile, suggesting that she scratched her neck while trying to free her airway.

10

the blood of . . . Kalaher by applying pressure to [her] throat or neck or by blocking [her] nose or mouth with the defendant's hand, hands, a ligature or an unknown object." The trial court entered a judgment of conviction, sentencing Harmel to life in prison without the possibility of parole. Harmel then appealed.

## DISCUSSION

We review evidence sufficiency first because that issue could lead to the greatest potential relief—a judgment of acquittal. *See Benavidez v. State*, 323 S.W.3d 179, 181 (Tex. Crim. App. 2010); *Medina v. State*, 565 S.W.3d 868, 873 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd); *Mixon v. State*, 481 S.W.3d 318, 321 (Tex. App.—Amarillo 2015, pet. ref'd).

## I. The evidence was sufficient to support the jury's findings that Harmel intended to kill Kalaher.

In his first issue, Harmel contends that "the evidence is insufficient to prove [that he] intentionally caused the death of the alleged victim where it is undisputed that she was alive when [he] left her."

We review evidence-sufficiency challenges under the standard from *Jackson v. Virginia*, 443 U.S. 307 (1979). *Owens v. State*, 549 S.W.3d 735, 740 (Tex. App.—Austin 2017, pet. ref'd). Under that standard, we consider all the evidence in the light most favorable to the verdict and decide whether any rational trier of fact could find the essential elements of the offense beyond a reasonable doubt. *Id.*

Circumstantial evidence is as probative as direct evidence in establishing an actor's guilt. *Id.* at 740–41. Circumstantial evidence alone may establish guilt. *Id.* In circumstantial-evidence cases, each fact need not point directly and independently to the actor's guilt as long as

11

the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Id.* at 741.

The factfinder is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Id.* The factfinder has a right to weigh and resolve conflicts in the evidence and to draw reasonable inferences from it. *Clayton v. State*, 235 S.W.3d 772, 778–79 (Tex. Crim. App. 2007). When the record supports conflicting inferences, we presume that the factfinder resolved conflicts in favor of the verdict and defer to that determination. *Owens*, 549 S.W.3d at 741.

The type of capital murder charged here required the State to prove that the defendant "intentionally commit[ted] the murder in the course of committing or attempting to commit kidnapping, . . . robbery, [or] aggravated sexual assault." *See* Tex. Penal Code § 19.03(a)(2). "Capital murder is a result-of-conduct offense; the crime is defined in terms of one's objective to produce . . . a specified result, i.e., the death of the named decedent." *Owens*, 549 S.W.3d at 741 (quoting *Louis v. State*, 393 S.W.3d 246, 251 (Tex. Crim. App. 2012)).

As charged here, an actor "intentionally" causes the death of an individual if the actor has the conscious objective or desire to cause that death. *See* Tex. Pen. Code § 6.03(a). An actor's mental culpability generally must be inferred from the circumstances under which the prohibited act or omission occurs. *Owens*, 549 S.W.3d at 741. "The specific intent to kill may be inferred from the use of a deadly weapon, unless in the manner of its use it is reasonably apparent that death or serious bodily injury could not result." *Medina v. State*, 7 S.W.3d 633, 637 (Tex. Crim. App. 1999) (quoting *Vuong v. State*, 830 S.W.2d 929, 934 (Tex. Crim. App. 1992)). A factfinder may infer that a defendant intends the natural consequences of his or her acts. *Id.* A factfinder may also infer the defendant's requisite intent from any facts tending to

12

prove its existence, including the method of committing the crime; the nature of the wounds inflicted on the victim; and the defendant's acts, words, and conduct. *Id.*

In a prosecution for capital murder, "the State is not required to prove that a defendant should have anticipated the specific method by which a person was killed." *In re State ex rel. Weeks*, 391 S.W.3d 117, 126 (Tex. Crim. App. 2013) (orig. proceeding). "[T]he method by which someone commits a murder is not relevant to evaluating the sufficiency of the evidence to support a conviction." *Id.* (citing *Johnson v. State*, 364 S.W.3d 292, 296 (Tex. Crim. App. 2012)). Thus, "[t]he State could allege 'poisoning, garroting, shooting, stabbing, or drowning,' of a single individual, and those different acts would simply be alternate methods of committing a single offense" of murder. *Johnson*, 364 S.W.3d at 296 (citing *Ngo v. State*, 175 S.W.3d 738, 746 n.27 (Tex. Crim. App. 2005)).

Harmel argues that the evidence is insufficient to support the jury's findings that he intentionally caused Kalaher's death because she was still alive when he left her. He says that the State's theory should be characterized as "delayed strangulation" and that the State was therefore "required to show that [Harmel] was aware of the concept of 'delayed strangulation' and intended to cause her death in that manner." Not so. Assuming delayed strangulation was the "method" here, the method by which Harmel caused Kalaher's death is not relevant to analyzing the sufficiency of the evidence to support his conviction. *See State ex rel. Weeks*, 391 S.W.3d at 126 (citing *Johnson*, 364 S.W.3d at 295–296). The evidence may be sufficient to establish that Harmel intentionally caused her death without needing to establish that Harmel intended that "delayed strangulation" be the method by which she would die.

The jury had before it evidence sufficient to support the necessary findings. Harmel admitted that he was in Kalaher's car on the day that she died. Surveillance video

13

showed him following her to her car. And it undermined his story about why the two were "meeting": he claimed to be meeting her because of their discussions on a sex website, but the jury reasonably could have believed that she went to the Walmart only to buy dog food and that she was then immediately going home because she had to work the next morning. Harmel then entered her Kia on the driver side, rather than on the passenger side as a guest usually might. Moreover, Detective Acevedo's review of Kalaher's and Harmel's electronic devices supported the reasonable inference that they had never interacted with each other before Kalaher left the Walmart. The jury was free to consider the lack of connections between Kalaher's and Harmel's phones and the inconsistency regarding the screen name on the sex website.

The condition in which she was found supports the reasonable inference that he strangled her to the point of unconsciousness and then left. Dr. Smock's testimony allowed the jury to reasonably infer that the feces stemmed from someone in the car being strangled for at least thirty seconds, which is past the point of unconsciousness and is the point at which Dr. Smock said that a victim loses control of the rectal sphincter. Harmel's statement that the scene of the car was "gross," even though he could not have known about the car's condition after he claims to have left it, could reasonably be considered by the jury to be evidence of strangulation then loss of control of the rectal sphincter while Harmel was still in the car. Dr. Dolinak testified that his injury findings led him to believe that a struggle had occurred. All this supports the reasonable inference of a struggle in the car that Kalaher lost, leaving her unconscious.

Kalaher's injuries from that struggle reasonably support the jury's conclusion regarding Harmel's intent to kill her. The autopsy results revealed two forms of strangulation—by hand and by ligature. The strangulation events were strong enough to break her hyoid, atypical

14

of her age. They were also strong enough to create extensive petechiae externally and internally and leave noticeable marks on her neck. The mark pointing to a ligature was likely made by a soft, cloth-like substance, which the jury could reasonably infer was from the missing tie string from her cover-up. Other bruises on her body suggest a struggle. And the scratches on her neck and the presence of her own DNA under her fingernails suggest that she was clawing at something on or near her neck to try to breathe. In all, it was reasonable for the jury to infer that the person who caused these kinds of injuries to Kalaher intended that she die.

The reasonable inferences supported by the evidence were bolstered by circumstances suggesting Harmel's consciousness of guilt. "Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt." *Ex parte Weinstein*, 421 S.W.3d 656, 668 (Tex. Crim. App. 2014) (quoting *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004)). And "consciousness of guilt is perhaps one of the strongest kinds of evidence of guilt." *Harris v. State*, 645 S.W.2d 447, 456 (Tex. Crim. App. 1983) (internal quotation omitted).

The jury reasonably could have inferred that Harmel tried to hide his truck by altering it and that he gave police inconsistent or misleading stories. His times for "meeting" Kalaher changed. He said that he stayed at Garcia's house long enough to shower and talk about several topics, but she testified that he was never there. He said that he drove up and down the nearby grocery store's parking lot looking for Kalaher the next day, but that store's surveillance video suggested otherwise.

Given all this, the evidence was sufficient to support the jury's conclusions that Harmel intentionally caused Kalaher's death. As a result, we overrule his first issue.

15

**II.** **Harmel's arguments about charge error relating to the intentional and knowing mental states are not grounds for reversal.**

In his second issue, Harmel contends that he was harmed by the trial court's allegedly erroneous "fail[ure] to include the correct definitions of the culpable mental state in the abstract portion of the charge." He argues three alleged errors: (1) The charge's definition of "intentionally causing the death of an individual" did not match the statutory definition of an actor's intentionally causing a result of the actor's conduct. (2) The charge failed to define the intentional mental state applicable to the aggravating felonies of kidnapping, robbery, and aggravated sexual assault, which the State charged as supporting capital murder. (3) The charge did not define "knowingly, or with knowledge," anywhere.

We review claims of charge error under the test from *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). *See Ngo*, 175 S.W.3d at 743–44. We first determine whether error exists, then we evaluate the harm, if any, caused by that error. *Id.* at 743.

### A. *Definition of "intentionally causing the death of an individual"*

The jury charge defined "intentionally causing the death of an individual": "A person intentionally causes the death of an individual if the person has the conscious objective or desire to cause that death." By contrast, Penal Code section 6.03(a) says, "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result."

Harmel's objection, in effect, is that the charge's definition of "intentionally causing the death of an individual" was missing the words "engage in the conduct," which is often called "nature of conduct." A "nature of conduct" offense is distinct from a "result of

16

conduct" offense. Capital murder is a "result of conduct" offense. *Owens*, 549 S.W.3d at 741 (quoting *Louis*, 393 S.W.3d at 251). The State must prove that the capital-murder defendant intended to cause the victim's death and not simply that the defendant intended to engage in the conduct that resulted in the victim's death. *See id.*

Had the charge's definition included the language from Section 6.03(a) that Harmel complains is missing—intending to engage in certain conduct—it would have allowed the jury to convict him for a mental state that is insufficient to support a capital-murder conviction. "Capital murder is a result-of-conduct offense; a jury charge which defines 'intentionally' as it relates to the nature of conduct as well as the result of conduct is, therefore, incorrect." *Medina*, 7 S.W.3d at 639. As a result, this was not an error in the charge.

### B. No "intentional" definition relating to the aggravating felonies of kidnapping, robbery, and aggravated sexual assault

Harmel argues that "no definition for 'intentionally, or with intent' was given for the underlying felonies." The jury charge lacked a general definition of the intentional mental state in the abstract portion of the charge. Elsewhere, there were abstract definitions relating to kidnapping, robbery, and aggravated sexual assault. The State needed to prove one of these aggravating felonies as part of its proof that Harmel committed capital murder. *See* Tex. Penal Code § 19.03(a)(2); *Patrick v. State*, 906 S.W.2d 481, 492 (Tex. Crim. App. 1995); *Riley v. State*, 447 S.W.3d 918, 922 (Tex. App.—Texarkana 2014, no pet.) ("[T]he elements of the underlying felony are necessary elements in proving capital murder."). When a capital-murder jury charge fails to define the aggravating felonies necessary to support a conviction for capital murder, the charge has "omitt[ed] an element of the offense" and is therefore erroneous. *Riley*, 447 S.W.3d at 923 (citing *Olivas v. State*, 202 S.W.3d 137, 143 (Tex. Crim. App. 2006)). To

support a conviction, "the jury must be unanimous in finding every constituent element of the charged offense." *Jourdan v. State*, 428 S.W.3d 86, 94 (Tex. Crim. App. 2014).

The application portion of the jury charge, because it "specifies the factual circumstances under which the jury should convict or acquit, . . . is the 'heart and soul' of the jury charge." *Vasquez v. State*, 389 S.W.3d 361, 367 (Tex. Crim. App. 2012). It is the application portion of the charge, not the abstract portion, that authorizes a conviction, and we "look at the wording of the application paragraph[s] to determine whether the jury was correctly instructed in accordance with the indictment." *Yzaguirre v. State*, 394 S.W.3d 526, 530 (Tex. Crim. App. 2013). A jury charge is adequate

> if it either contains an application paragraph specifying all of the conditions to be met before a conviction . . . is authorized, or contains an application paragraph authorizing a conviction under conditions specified by other paragraphs of the jury charge to which the application paragraph necessarily and unambiguously refers, or contains some logically consistent combination of such paragraphs.

*Delapaz v. State*, 228 S.W.3d 183, 212 (Tex. App.—Dallas 2007, pet. ref'd) (quoting *Plata v. State*, 926 S.W.2d 300, 304 (Tex. Crim. App. 1996), *overruled on other grounds*, *Malik v. State*, 953 S.W.2d 234 (Tex. Crim. App. 1997)).

If "the application portion essentially tracks the indictment" and properly instructs the jury, then there is no error in the charge. *See Martin v. State*, 252 S.W.3d 809, 814–15 (Tex. App.—Texarkana 2008), *pet. dism'd as improvidently granted*, No. PD-0807-08, 2009 WL 949074 (Tex. Crim. App. Apr. 8, 2009). "[F]ailure to give an abstract instruction is reversible only when such an instruction is necessary to correct or complete understanding of concepts or terms in the application part of the charge." *Arteaga v. State*, 521 S.W.3d 329, 338 (Tex. Crim. App. 2017)

18

(quoting *Plata*, 926 S.W.2d at 302); *Warfield v. State*, 974 S.W.2d 269, 271 (Tex. App.—San Antonio 1998, pet. ref'd) (also quoting *Plata*).

Harmel argues that the charge failed to define the applicable intentional mental state as it relates to proving each of the aggravating felonies of kidnapping, robbery, and aggravated sexual assault. As to robbery and aggravated sexual assault, this is untrue. The abstract portion of the charge defined robbery:

> A person commits robbery if, in the course of committing theft and with intent to obtain or maintain control of the property, the person either:
>
>> 1. intentionally, knowingly, or recklessly causes bodily injury to another; or
>>
>> 2. intentionally or knowingly threatens or places another in fear of imminent bodily injury or death.
>
>  . . . .
>
> "Intentionally causing bodily injury" means that it is the person's conscious objective or desire to cause the bodily injury to another.
>
>  . . . .
>
> "Intentionally threaten" means that the person has the conscious objective or desire to engage in conduct constituting a threat.
>
>  . . . .
>
> "Intentionally place in fear" means the person has the conscious objective or desire to place the other person in fear.

Similarly, the abstract portion of the charge also defined aggravated sexual assault:

> A person commits the offense of sexual assault if the person intentionally or knowingly -
>
>> a. causes the penetration of the anus or sexual organ of another person by any means without that person's consent;

19

b. causes the penetration of the mouth of another person by the sexual organ of the actor, without that person's consent; or

c. causes the sexual organ of another person, without that person's consent, to contact or penetrate the mouth, anus, or sexual organ of another person, including the actor.

. . . .

A person commits the offense of aggravated sexual assault if the person commits Sexual Assault, as defined above, and

a. causes serious bodily injury to another; or

b. uses or exhibits a deadly weapon during the commission of the assault.

"Intentionally causing penetration" means the person has the conscious objective or desire to cause the penetration.

The application portion of the charge asked the jury to "determine whether the State has proved, beyond a reasonable doubt," that Harmel intentionally caused Kalaher's death "in the course of committing or attempting to commit Kidnapping, Robbery, or Aggravated Sexual Assault." These application instructions "necessarily and unambiguously refer[red]" to the preceding definitions of those felonies. *See Delapaz*, 228 S.W.3d at 212 (quoting *Plata*, 926 S.W.2d at 304). The intent definitions accompanying robbery and aggravated sexual assault appropriately completed the jury's understanding of the application paragraphs for those two felonies. *See Arteaga*, 521 S.W.3d at 338 (quoting *Plata*, 926 S.W.2d at 302). Thus, the charge contained no error as it relates to the intentional mental state specific to proving robbery or aggravated sexual assault. *See id.*; *Martin*, 252 S.W.3d at 814–15.

When the abstract portion of the charge defined kidnapping, however, it omitted any definition of the intentional mental state specific to proving that offense:

20

> A person commits the offense of kidnapping if he intentionally or knowingly abducts another person.
>
> "Abduct" means to restrain a person with the intent to prevent his liberation by either secreting or holding him in a place where he is not likely to be found or using or threatening to use deadly force.

Crucially, however, Harmel invited this omission. In his objections to the jury charge, he argued that an "entire section entitled 'Definitions' should be omitted because: . . . [t]he definitions of 'Intentionally restricting another's movements,' 'knowingly restricting another's movements' and 'Intent to prevent liberation' are not statutory definitions and seek to add some sort of application language." At the charge conference, the trial court sustained this objection in part:

> [T]he request that the entire section of definitions be [o]mitted, that's—that is denied; however, we are going to modify and change the definitions of "kidnapping." We're going to leave the first initial sentence under kidnapping on page 7 of the State's proposed charge. . . . The definition of "abduct" will remain. The definition of "restrain" and "restraint without consent" all the way through page 9 of the definition of "intent to prevent liberation," all of that will be stricken from the charge.

Thus, it was at Harmel's request that the trial court removed the definition of the intentional mental state specific to proving kidnapping.

"[I]f a party affirmatively seeks action by the trial court, that party cannot later contend that the action was error. . . . [T]he law of invited error estops a party from making an appellate error of an action it induced." *Druery v. State*, 225 S.W.3d 491, 505–06 (Tex. Crim. App. 2007) (quoting *Prystash v. State*, 3 S.W.3d 522, 531 (Tex. Crim. App. 1999)), *habeas corpus denied sub nom. Druery v. Thaler*, 647 F.3d 535, 545–46 (5th Cir. 2011). When invited error applies to an appellant's jury-charge complaint, an appellate court should not review the complaint for error in the charge or for whether any error harmed the appellant. *See id.* at 506

21

("Because Druery is estopped from bringing this charge-error claim on appeal, we do not address whether the omission of and failure to *sua sponte* give the lesser-included instruction was erroneous or amounted to egregious harm.").

Because Harmel requested that the trial court remove the definitions of mental states specific to proving kidnapping, he cannot now complain that "no definition for 'intentionally, or with intent' was given for the underlying felon[y]" of kidnapping. Thus, Harmel is estopped from making an appellate error of his charge complaint about the intentional mental state as it relates to kidnapping.

### C.     No general "knowing" definition

Finally, Harmel argues that the charge erroneously "failed to instruct the jury on the definition of 'knowingly or with knowledge'" anywhere. Harmel is correct that the charge contained no abstract general definition of the knowing mental state. But if this had been in the charge, it would have lessened the burden of proof required of the State. Harmel was indicted and tried for intentionally causing Kalaher's death in the course of committing or attempting to commit one of the three aggravating felonies. *See* Tex. Penal Code § 19.03(a)(2). Thus, the charge contained no error by omitting the knowing mental state as it relates to proving capital murder. *See Alvarado v. State*, 912 S.W.2d 199, 216 (Tex. Crim. App. 1995) ("Appellant was indicted for the *intentional* capital murder of Carmen Sustaita under Texas Penal Code § 19.03(a)(2). Thus, the trial court erred in instructing the jury that it could find appellant guilty of her capital murder if it found merely that appellant *knowingly* caused her death during the course of robbery." (emphases in original)).

22

As to kidnapping, Harmel is estopped by the invited-error doctrine for the same reasons as explained above. The trial court removed all the definitions involving mental states specific to kidnapping at Harmel's request.

As to robbery, the charge instructed the jury:

"Knowingly causing bodily injury" means that the person is aware that the person's conduct is reasonably certain to cause the bodily injury to another.

. . . .

"Knowingly threaten" means the person is aware that the person's conduct constitutes a threat.

. . . .

"Knowingly place in fear" means the person is aware that the person's conduct is reasonably certain to cause fear in the other.

The charge therefore was not missing the relevant definitions of the knowing mental state specific to proving robbery.

And for aggravated sexual assault, the charge instructed the jury that "'[k]nowingly causing penetration' means the person is aware that his conduct is reasonably certain to cause that penetration." The charge therefore was not missing the relevant definition of the knowing mental state specific to proving aggravated sexual assault.

As with the intentional mental state, the charge's application paragraphs asked the jury to "determine whether the State has proved, beyond a reasonable doubt," that Harmel intentionally caused Kalaher's death "in the course of committing or attempting to commit Kidnapping, Robbery, or Aggravated Sexual Assault." These instructions "necessarily and unambiguously refer[red]" to the preceding definitions of those felonies. *See Delapaz*, 228 S.W.3d at 212 (quoting *Plata*, 926 S.W.2d at 304). The "knowing" definitions accompanying robbery

23

and aggravated sexual assault appropriately completed the jury's understanding of the application paragraphs for robbery and aggravated sexual assault. *See Arteaga*, 521 S.W.3d at 338 (quoting *Plata*, 926 S.W.2d at 302). Thus, the charge contained no error as it relates to the knowing mental state specific to proving robbery or aggravated sexual assault. *See id.*; *Martin*, 252 S.W.3d at 814–15.

For all these reasons, we overrule Harmel's second issue.

### III. Harmel failed to object when the State offered extraneous-act evidence, so the trial court had no obligation to include his requested instructions in the jury charge.

In his third issue, Harmel contends that the jury charge should have included limiting instructions about Rule of Evidence 404(b) and the burden of proof for evidence of extraneous acts. He says that the extraneous acts about which the State offered evidence were that he "lied to police, avoided a second interview with police, and lied to three witnesses." He argues that he preserved error through his proposed jury charge, his written objections to the charge, and his oral objections during the charge conference. But he does not identify any objection when the evidence was offered during the guilt–innocence phase of the trial, and we have not found any such objection in the record.

The State may offer "[e]vidence of a crime, wrong, or other act" in limited circumstances. *See* Tex. R. Evid. 404(b)(1). The State should not offer this evidence "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." *Id.* But it may offer it "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Tex. R. Evid. 404(b)(2). To be admissible, the evidence must also be "relevant to a

24

material issue in the case," and its "probative value" must not be "significantly outweighed by its prejudicial effect." *Segundo v. State*, 270 S.W.3d 79, 87 (Tex. Crim. App. 2008).

When properly requested by defense counsel, the trial court must give the jury a limiting instruction about both (1) the proper purposes of evidence of extraneous acts and (2) the State's burden of proof—beyond a reasonable doubt—when offering evidence of extraneous acts. *See Delgado v. State*, 235 S.W.3d 244, 251 (Tex. Crim. App. 2007). Absent a timely objection, the evidence may be admitted for all purposes, rather than for merely Rule 404(b)'s limited purposes:

> [I]f a defendant does not request a limiting instruction under Rule [of Evidence] 105 at the time that evidence is admitted, then the trial judge has no obligation to limit the use of that evidence later in the jury charge. . . . Once evidence has been admitted without a limiting instruction, it is part of the general evidence and may be used for all purposes.

*Delgado*, 235 S.W.3d at 251. The Court of Criminal Appeals has therefore reasoned that guilt–innocence charge instructions about Rule 404(b) and about the beyond-a-reasonable-doubt burden of proof for extraneous acts are required only if the defense objected when the evidence was offered. "[A] limiting instruction" under Rule 404(b) "should be requested, and given, in the guilt-stage jury charge only if the defendant requested a limiting instruction at the time the evidence was first admitted." *Id.* "[A] defendant is entitled to limiting instructions on the use of extraneous offenses during the guilt phase only if he timely requests those instructions when the evidence is first introduced." *Id.* at 253. And even when a Rule 404(b) limiting instruction would be proper to give, the trial court has "no duty to include one in the jury charge for the guilt phase [when] appellant fail[s] to request one at the time the evidence was offered." *Id.* at 254.

This is true for the burden-of-proof instruction for extraneous acts too. When the trial judge's duty to give a Rule 404(b) limiting instruction is not triggered, "it naturally follows that he had no duty to instruct the jury on the burden of proof concerning an extraneous offense" either. *Id.* at 254.

Based on *Delgado*, we hold that the lack of any timely objection when the evidence was offered coupled with the lack of any request for an instruction when the evidence was admitted is fatal to Harmel's jury-charge complaint on appeal. Though the defendant in *Delgado* failed to object when the evidence was offered, failed to request a limiting instruction when the evidence was admitted, and failed to object to the charge, it was the failure to object or request a limiting instruction that forfeited his jury-charge complaint. Several of our sister courts have held the same. *See Ryder v. State*, 514 S.W.3d 391, 402–03 (Tex. App.—Amarillo 2017, pet. ref'd) ("[I]n the absence of a request for a limiting instruction made when the evidence is admitted, . . . the court has no obligation to include such an instruction in the jury charge."); *Irielle v. State*, 441 S.W.3d 868, 880 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("[W]hen Ethan testified about the four alleged 'other wrongs or acts,' appellant did not request a limiting instruction. Accordingly, . . . the evidence was admissible for all purposes; and the trial court had no duty to include a Rule 404(b) limiting instruction in the charge. Because the trial court had no duty to give *any* limiting instruction concerning extraneous offenses in the jury charge, it naturally follows that the court had no duty to limit the jury's use of 'other wrongs or acts' evidence."); *Russel v. State*, 425 S.W.3d 462, 467 n.3, 468 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) (reasoning that defendant's failure to object and to "immediately request a limiting instruction" for evidence of prior felony conviction meant that defendant was not entitled to related limiting instruction in "guilt-stage charge," under *Delgado*); *Salazar v. State*,

26

330 S.W.3d 366, 367–68 (Tex. App.—San Antonio 2010, no pet.) ("Here, when the evidence was first admitted appellant did not request an instruction that the extraneous acts must be considered only for the purpose for which they are offered; therefore, he was not entitled to such a limiting instruction in the jury charge.").

Also, "[b]ecause the trial judge had no duty to give *any* limiting instruction concerning the use of an extraneous offense in the guilt-phase jury charge"—because Harmel did not request an instruction or object when the evidence was admitted—"it naturally follows that [the judge] had no duty to instruct the jury on the burden of proof concerning an extraneous offense." *See Delgado*, 235 S.W.3d at 254. We therefore hold that the trial court had no duty to give the requested burden-of-proof instruction in the jury charge. As a result, we overrule Harmel's third issue.

## IV. The warrants to search Harmel's cellphones were sufficiently particular, and the search was timely.

In his fourth issue, Harmel contends that the trial court abused its discretion in denying his motion to suppress evidence obtained from two cellphones. He argues that the phones were not adequately described in the warrants issued to search them and because one of those two warrants was not timely executed.

We review a trial court's ruling on a motion to suppress for an abuse of discretion, giving a trial court almost complete deference to its "rulings on application of the law to questions of fact and to mixed questions of law and fact, if resolution of those questions depends on an evaluation of credibility and demeanor." *Arguellez v. State*, 409 S.W.3d 657, 662 (Tex. Crim. App. 2013) (quoting *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010)). "[F]or mixed questions of law and fact that do not fall within that category, a reviewing court may conduct a

27

*de novo* review." *Id.* (quoting *Crain*, 315 S.W.3d at 48). When the trial court does not make express fact findings, we must view the evidence in the light most favorable to the trial court's rulings and assume that it made implicit fact findings that find support in the record. *Id.* We sustain the trial court's decision if it is correct on any applicable theory of law. *Id.* at 662–63.

The Fourth Amendment mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The Amendment's "particularity requirement 'assures the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his powers to search.'" *Bonds v. State*, 403 S.W.3d 867, 874 (Tex. Crim. App. 2013) (quoting *Groh v. Ramirez*, 540 U.S. 551, 561 (2004)). The requirement serves the goals of

> (1) ensuring that the officer searches the right place; (2) confirming that probable cause is, in fact, established for the place described in the warrant; (3) limiting the officer's discretion and narrowing the scope of his search; (4) minimizing the danger of mistakenly searching the person or property of an innocent bystander or property owner; and (5) informing the owner of the officer's authority to search that specific location.

*Id.* at 874–75 (citing *Long v. State*, 132 S.W.3d 443, 447 (Tex. Crim. App. 2004)).

"A warrant is sufficiently particular if it enables the officer to locate the property and distinguish it from other places in the community." *Id.* at 875. "[T]he Fourth Amendment does not require perfection in the warrant's description of the place to be searched." *Id.* A warrant description of the items to be searched or seized is sufficiently particular if it provides enough specifics that the officer executing the warrant will "reasonably know what items are to be seized." *Porath v. State*, 148 S.W.3d 402, 410 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (citing *United States v. Layne*, 43 F.3d 127, 132 (5th Cir. 1995)).

28

Absent exceptional circumstances not present here, when the State seeks to search a cellphone pursuant to a lawful arrest, it must obtain a warrant that, among other things, identifies the cellphone to be searched and states the name of its owner or possessor. *See* Tex. Code Crim. Proc. art. 18.0215(a), (c)(2)–(3), (d).

Harmel first notes that a black Samsung model SGH-T919 cellphone of his was searched. The phone was first seized when Harmel was arrested, and it stayed in the Cedar Park Police Department's evidence room for several years before Detective Acevedo searched it. The warrant described the phone as belonging to Harmel; located in the evidence room; and as "Black Samsung model: SGH-T919, SSN: T919GSMH, Serial Number: R3TQA83939M, IMEI: 354321/02/144880/0." Harmel admits that all of this information accurately describes his phone, save for the serial number, which is actually "R3TQA63939M," replacing the "8" with a "6."

This wrong digit in the warrant meant that its description of the phone was not perfect, but it did not have to be. *See Bonds*, 403 S.W.3d at 875. We hold that the warrant's accurate descriptions of the phone's location; owner; color; manufacturer; and model, SSN, and IMEI numbers together permitted law enforcement to reasonably locate the phone to be searched and to distinguish it from others. *See id.* at 874–75; *Porath*, 148 S.W.3d at 410. And we hold that the single-digit change in the eleven-character serial number, which was otherwise in the correct character sequence, did not make this warrant's otherwise-accurate description insufficiently particular. *Cf. Graves v. State*, 336 S.W.2d 156, 158 (Tex. Crim. App. 1959) (reasoning that "discrepancy between the description of the missing radio and the radio recovered from appellant because the letter appearing before the serial number on the invoice was not on the radio recovered" did not undermine conclusion that radios were one and the

same because appellant told officer that radio belonged to complainant and "came from the same stock").

Harmel next notes a similar problem with a brown/black Samsung cellphone of his that the State seized from him several years earlier, upon his arrest, and later searched. The search warrant identified the phone as belonging to Harmel; being in the Cedar Park Police Department's evidence room; and as "Brown/Black Samsung, Serial Number: R1Y8523166Z, IMEI: 355795/01/597966/9." This information also accurately described the particular phone, save for (1) inaccurately substituting an "8" in the serial number when the actual number contained an "S" at that position in the eleven-character sequence and (2) inaccurately substituting a terminal "9" in the IMEI number when the actual number contained a "5" at that position in the fifteen-number sequence. Even though this warrant has these two errors, we reach the same conclusions here as we did with the black Samsung. We hold that the warrant's description for the brown/black Samsung, including its owner and where it could be found, was sufficiently particular under the governing standards. *See Bonds*, 403 S.W.3d at 874–75; *Porath*, 148 S.W.3d at 410; *cf. Graves*, 336 S.W.2d at 158.

Finally, Harmel argues that the search pursuant to the warrant for the black Samsung phone was untimely because it "was not executed within three days as required by" Code of Criminal Procedure article 18.06(a). The phone was originally seized from Harmel when he was arrested in 2009, and Harmel does not challenge that seizure. The phone remained in the evidence room since then. The warrant he challenges was issued in 2018.

Since September 1, 2011, Code of Criminal Procedure article 18.07(c) has provided for a special warrant-effectiveness period for warrants to search cellphones:

> If a warrant is issued to search for and seize data or information contained in or on a . . . cellular telephone . . . , the warrant is considered to have been executed within the time allowed under Subsection (a) if the device was seized before the expiration of the time allowed. Notwithstanding any other law, any data or information contained in or on a device seized may be recovered and analyzed after the expiration of the time allowed under Subsection (a).

Act of May 25, 2011, 82d Leg., R.S., ch. 772, §§ 1–3, 2011 Tex. Gen. Laws 1803, 1803–04. Here, the warrant at issue was signed by a magistrate on January 12, 2018. Detective Acevedo testified that he received both the signed warrant and the phone to be searched also on January 12, 2018. But the phone itself was originally seized in 2009. Under Article 18.07(c), then, the search pursuant to this warrant was not untimely.

For all these reasons, we overrule Harmel's fourth issue.

## CONCLUSION

We affirm the trial court's judgment of conviction.

_____

Chari L. Kelly, Justice

Before Justices Goodwin, Baker, and Kelly

Affirmed

Filed: February 26, 2020

Publish

31