Jeff Rose, Chief Justice
A jury convicted Rashad Owens of capital murder for killing four people in the same criminal transaction as he drove through a barricaded street during the SXSW music festival in downtown Austin. See Tex. Penal Code § 19.03(a)(7)(A). Because the State did not seek the death penalty, Owens automatically received a sentence of life in prison without parole. See id. § 12.31(a)(2). In four appellate issues, Owens contends that there was insufficient evidence to support his conviction, that the State's closing argument was improper, that the district court erred by denying Owens's requested voir dire question, and that it erred by denying his requested jury-charge instruction. We will modify the district court's judgment of conviction to reflect that the "Degree of Offense" was a capital felony, not a first-degree felony, and affirm the judgment as modified.
BACKGROUND
Owens was indicted for capital murder and four counts of felony murder while evading arrest. See id. §§ 19.02, .03. Owens and two acquaintances, Andrew Bramwell and Alex Witherspoon, had traveled from Killeen to Austin. Bramwell testified that he used his car to drive Owens and Witherspoon, who were scheduled to perform at a club that evening. Bramwell testified that after they arrived at the club, Owens went to the car to get CDs with backing music for the performance. But according to Bramwell, Owens left the club in Bramwell's car without permission and did not return.
Events leading to the indicted offenses were captured on a patrol-car video. The video shows Owens driving in the dark with the car's daytime running lights activated, but not its headlights, heading west *739 on 12th Street toward IH-35, then making a left turn onto the access road of southbound IH-35 from the right lane on 12th Street, cutting in front of a patrol car. The officer in the patrol car testified that he suspected Owens was driving without using headlights and that he activated his patrol car's overhead lights after Owens made the illegal left turn. Owens pulled into a Shell gas station at the corner of the IH-35 access road and 9th Street. Video from the gas station shows Owens appearing to slow as he drove toward the space between the gas station's convenience store and cars parked at the gas pumps. The patrol car also slowed and then stopped near the entrance of the gas station. But Owens did not stop. He drove out of the gas station, turning the wrong way westbound onto 9th Street-a one-way street-with the patrol car following about half a block behind.
The first intersection on 9th Street west of IH-35 is Red River. Maps, photographs, video footage, and witness testimony showed that an apartment complex and two music venues, at the time hosting SXSW shows, were located on Red River between 9th and 10th streets. Red River was closed to through traffic as designated by portable barricades, cones, and signs. A police officer stationed at the barricade on Red River at 9th Street testified that although Red River was blocked, there was some room between the barricade and the sidewalk to allow any emergency vehicles to pass and for residents of the apartments to access their parking garage.
The driver of a truck eastbound on 9th Street testified that while she was stopped for pedestrians crossing at the Red River intersection, she saw a car come out of the gas station at the end of 9th Street "going really fast" toward her, traveling the wrong direction. She stated that she tried unsuccessfully to alert the oncoming driver by flashing the lights on her truck and honking. Patrol-car video shows that Owens turned right from 9th Street onto Red River, going past a "Road Closed" sign and barricades. The police officer testified that when he turned onto Red River behind Owens, his patrol car had to "squeeze between the barricade and the curb."
The jury heard testimony that Red River was crowded with pedestrians when Owens drove onto the street. Eyewitnesses testified that Owens hit several people, throwing them into the air, but that Owens kept going. Multiple witnesses, including some who were hit by the car, testified that they heard the car accelerate as it drove through the crowded street and that they never saw the car's brake lights illuminated. A certified mechanic who examined the car after the offenses occurred testified that "[m]echanically speaking, the braking system was completely intact" and functioning. Bramwell testified that his car was new when he bought it two years before Owens used it and that there was nothing wrong with the car. An accident reconstructionist testified that the car's speed exceeded 55 miles per hour as Owens drove north on Red River between 9th and 10th streets.
Patrol-car video shows that after hitting the first victims on Red River between 9th and 10th streets, Owens continued driving north on Red River toward 11th Street. The video further shows that Owens swerved around a blue car stopped at a red light on Red River at 11th Street. The driver of the blue car testified that he drove to Red River from 10th Street and that he noticed a barricade blocking Red River at the intersection with 10th Street. He testified that he turned right from 10th Street onto Red River carefully because of the crowds of pedestrians that were crossing Red River and on the sidewalks, including people who were getting on or off *740 of motorcycles and bicycles. Halfway up the block between 10th and 11th streets, the driver stated that he saw a car coming from behind him at a high rate of speed and that he told his passenger to brace for impact. When none occurred, he knew that his car had been avoided. He testified that he then heard a loud crash coming from his right and behind his car, which he realized was a collision in the lane next to him, involving motorcyclists and a bicyclist he had seen earlier on 10th Street. The driver saw "motorcycles and bodies and things sort of flying through the air," landing at the corner of 11th Street. He further testified that he saw the car that hit them continue along, hitting a taxicab at the intersection of 11th Street, and spinning into a parking lot.
The police officer driving behind Owens similarly testified that he saw the car run a red light at 11th Street, that he "observed several more people flying 20 or 30 feet in the air and being thrown," and that the car then broadsided a white cab. According to the officer, the impact of that collision redirected the car Owens was driving to the northwest curb of a parking lot at 11th Street and Red River, where the car stopped after crashing into a parked van. Photos from the scene admitted into evidence show that the car's front and side airbags deployed. The accident reconstructionist testified that the car's airbag-control module or "black box" recorded the car's throttle percentage-i.e., how far the gas pedal was pressed down-as increasing from 65% to 100% during the time that Owens drove on Red River.
After crashing into the van, Owens attempted to flee the scene on foot, but police apprehended him. The jury saw patrol-car video of Owens's interaction with police after his arrest, in which he stated that he hoped he had not killed anybody. But the evidence at trial showed that Owens struck multiple people while driving on Red River, injuring dozens in the crowd and causing the deaths of four people: Steven Craenmehr, Sandy Le, Deandre Tatum, and Jamie West. A forensic scientist testified that Owens had a blood-alcohol content of .095, and a toxicology chemist testified that Owens tested positive for marihuana.
At the conclusion of the trial, the jury found Owens guilty on all charges as alleged in the indictment. The district court rendered judgment on the capital-murder count, sentencing Owens to life imprisonment without the possibility of parole. Owens filed a motion for new trial that was overruled by operation of law. This appeal followed.
DISCUSSION
Sufficiency of evidence supporting Owens's conviction
In his first issue, Owens contends that the evidence at trial was insufficient to support his capital-murder conviction. Specifically, Owens's challenge to the sufficiency of the evidence is that there was no evidence that he had the requisite culpable mental state of "knowingly" engaging in conduct that was reasonably certain to result in death.
We review the sufficiency of the evidence as to Owens's conviction under the standard set forth in Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), considering all the evidence in the light most favorable to the verdict to decide whether any rational trier of fact could find the essential elements of the offense beyond a reasonable doubt. See ids="6182418" index="3" url="https://cite.case.law/us/443/307/">id. at 319, 99 S.Ct. 2781 ; Temple v. State , 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). Circumstantial evidence is as probative as direct evidence in establishing an actor's guilt, and an actor's guilt can be *741 established with circumstantial evidence alone. Temple , 390 S.W.3d at 359. In circumstantial-evidence cases, each fact need not point directly and independently to the defendant's guilt as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. Id. The jury is the sole judge of the credibility and weight of witness testimony. Jackson , 443 U.S. at 319, 99 S.Ct. 2781. When the record supports conflicting inferences, we presume that the jury resolved conflicts in favor of the verdict and defer to that determination. Temple , 390 S.W.3d at 360 (citing Jackson , 443 U.S. at 326, 99 S.Ct. 2781 ).
Murder, as charged in this case, requires proof that a person "intentionally" or "knowingly" caused the death of another person. See Tex. Penal Code § 19.02(b)(1). Capital murder requires proof that a person murdered more than one person during the same criminal transaction. See id. § 19.03(a)(7)(A). "Capital murder is a result-of-conduct offense; the crime is defined in terms of one's objective to produce, or a substantial certainty of producing, a specified result, i.e., the death of the named decedent." Louis v. State , 393 S.W.3d 246, 251 (Tex. Crim. App. 2012) (quoting Roberts v. State , 273 S.W.3d 322, 329 (Tex. Crim. App. 2008), abrogated in part on other grounds by Ex parte Norris , 390 S.W.3d 338, 341 (Tex. Crim. App. 2012) ). Murder is committed "knowingly" when an actor engages in conduct while aware that death is reasonably certain to result from his conduct. Medina v. State , 7 S.W.3d 633, 640 (Tex. Crim. App. 1999) (citing Tex. Penal Code §§ 6.03(b) (defining culpable mental states), 19.02(b)(1)). To be aware that his conduct is reasonably certain to result in death, the actor must also be aware of the lethal nature of his conduct. Id.
Mental culpability is of such a nature that it generally must be inferred from the circumstances under which a prohibited act or omission occurs. Hernandez v. State , 819 S.W.2d 806, 810 (Tex. Crim. App. 1991), overruled on other grounds by Fuller v. State , 829 S.W.2d 191 (Tex. Crim. App. 1992). A jury may infer that a defendant intends the natural consequences of his acts. Herrera v. State , 526 S.W.3d 800, 810 (Tex. App.-Houston [1st Dist.] 2017, pet. ref'd) (citing Ruffin v. State , 270 S.W.3d 586, 591-92 (Tex. Crim. App. 2008) ). A jury may also infer a defendant's knowledge or intent from any facts tending to prove its existence, including the method of committing the crime, the nature of wounds inflicted on the victims, and the accused's acts, words, and conduct. Hart v. State , 89 S.W.3d 61, 64 (Tex. Crim. App. 2002). Further, a "jury may infer the intent to kill from the use of a deadly weapon unless it would not be reasonable to infer that death or serious bodily injury could result from the use of the weapon." Jones v. State , 944 S.W.2d 642, 647 (Tex. Crim. App. 1996) ; see Pitonyak v. State , 253 S.W.3d 834, 844 (Tex. App.-Austin 2008, pet. ref'd) (noting that when evidence shows defendant used deadly weapon in deadly manner, inference is almost conclusive that defendant intended to kill); cf. Cates v. State , 102 S.W.3d 735, 738-39 (Tex. Crim. App. 2003) (considering several factors in determining whether defendant used his vehicle in deadly manner, including duration of pursuit of defendant, defendant's compliance with traffic signal, traffic conditions, and whether defendant's use of vehicle actually endangered anyone).
Here, the court's charge included the following instructions on the culpable mental states for capital murder:
With respect to the offense of capital murder a person acts intentionally or with intent, with respect to a result of *742 his conduct when it is his conscious objective or desire to cause the result.
With respect to the offense of capital murder a person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.
Owens contends that there was no evidence of his culpable mental state for capital murder and that the evidence showed only his intent to evade, his reckless driving, his intoxication when he fled from the officer, and marihuana in his system.
After considering all the evidence presented at trial in the light most favorable to the jury's verdict, we conclude that there was sufficient evidence to support Owens's capital-murder conviction. The jury heard testimony that a truck facing Owens's direction flashed its lights and honked at him while he was driving the wrong way on 9th Street. The driver of that truck stated that she was stopped there for pedestrians who were crossing in front of her at the intersection of 9th Street and Red River. The jury saw the patrol-car video showing that every vehicle parked beyond the gas station on 9th Street and the stop sign at the intersection of 9th Street and Red River was facing the opposite direction of Owens's travel. The video also shows that as Owens turned right onto Red River, he drove past pedestrians in the crosswalk immediately in front of him on the west side of 9th Street and past a "Road Closed" sign and barricades on Red River. The police officer behind Owens testified that he had to "squeeze" his patrol car between a barricade and the curb to turn onto Red River. The jury also heard testimony that as Owens drove on Red River, people were screaming, there were loud, thudding sounds as the car was hitting bodies and sending them flying in the air, and some bodies were rolling off of the car. Further, the jury heard testimony that Owens never applied the car's brakes after hitting multiple people, that Owens accelerated to a speed of over 55 miles per hour on Red River, and that Owens had pressed down fully on the car's gas pedal.
Based on this evidence, a rational jury could have inferred that Owens was aware that his conduct of driving the wrong way down 9th Street, rounding into the intersection of a street where traffic was restricted and pedestrians were present, and increasing his speed as he drove there was reasonably certain to result in death. See Hart , 89 S.W.3d at 64. A rational jury could have also inferred that Owens was aware that his conduct of flooring the gas pedal of the car as he continued on Red River-after he had already hit or run over multiple people with the car-was also reasonably certain to result in death. See id. A rational jury could have further inferred that Owens was aware that his conduct was reasonably certain to result in death based on his statements that he hoped he did not kill anyone. See ids="9318621" index="29" url="https://cite.case.law/sw3d/89/61/#p64">id. Additionally, the jury could have inferred from the evidence in this record that Owens "intended the natural consequences of his acts" and inferred his intent to kill from his use of the car, which was a deadly weapon, in a deadly manner. See Jones , 944 S.W.2d at 647 ; cf. Cates , 102 S.W.3d at 738-39 (concluding that defendant did not use his vehicle in deadly manner because, among other things, pursuit of defendant was brief and ended when his vehicle was properly stopped at traffic light, no other traffic was present on road at time, and there was no evidence that defendant's vehicle actually endangered anyone as defendant fled from accident scene).
Further, the jury heard testimony and saw patrol-car video showing that before Owens crashed the car into the van, he successfully avoided colliding with another *743 car by swerving to the right. Given that evidence, the jury could have rejected the defense's suggestion at trial that Owens's culpability was mitigated by his inability to see what was ahead of him-either because his headlights were off or because of a shattered windshield-and that he had insufficient time to perceive and react to people or objects on Red River because of his driving speed or his impairment from alcohol or marihuana.
The jury was entrusted with assessing the credibility and demeanor of the witnesses. See Temple , 390 S.W.3d at 363. The testimony and circumstantial evidence presented at trial and reasonable inferences therefrom, considered in the light most favorable to the verdict, show that the jury was rationally justified in finding beyond a reasonable doubt that Owens had the requisite culpable mental state-i.e., that he acted with awareness that his conduct was reasonably certain to result in death-and that he murdered multiple people in the same criminal transaction while evading arrest. See id. at 360 ; see also Louis , 393 S.W.3d at 251 ; Medina , 7 S.W.3d at 640. The jury's determination was warranted by the combined and cumulative force of all the incriminating circumstances in this record and was not "so outrageous that no rational trier of fact could agree." See Temple , 390 S.W.3d at 359, 363 (quoting Wirth v. State , 361 S.W.3d 694, 698 (Tex. Crim. App. 2012) ). To the extent that this record supports conflicting inferences, we must presume the jury resolved conflicts in favor of its verdict and defer to that determination. See ids="7317144" index="35" url="https://cite.case.law/sw3d/361/694/#p698">id. at 360 (citing Jackson , 443 U.S. at 326, 99 S.Ct. 2781 ). Thus, we overrule Owens's challenge to the sufficiency of the evidence supporting his conviction.
Owens's challenge to propriety of State's closing argument
In his second issue, Owens challenges the propriety of the State's closing argument, contending that it misstated the law. During closing, the prosecutor discussed the culpable mental states set forth in the charge and noted that Owens was "aware that his conduct could kill people," and that Owens "knew what he was doing." Owens did not object to these statements. When Owens subsequently objected to statements that the prosecutor made during closing, Owens acknowledged that the State had made the complained-of argument twice before:
[Prosecutor]: If this case were called homicide and not capital murder, I think you would come back in here in about five or ten minutes. But because we call it capital murder, now we have to pump the brakes. When all we're asking you is, did he know that he could kill somebody based on his actions? I implore you-implore you-when you go in the back, there is a whiteboard up there. You just write down one or two words. Know, or aware. That's what this whole case is about. They want to intermix he didn't intend to kill anybody. We're not saying he did. We're saying that he knew what he was doing, and as a result, four people lost their lives. Just write-just write one word: Know or aware.
[Defense counsel]: Your Honor, I'm going to have to object to the misstatement of the law. Mr. Chavez has twice now misstated the law.
The Court: Okay.
[Defense counsel]: The law does not state merely aware. It doesn't state could. The law is very specific on whether the conduct-
The Court: Thank you. Ladies and gentlemen, you've been given the charge of the Court and you have the law in the charge and you will follow that, and that *744 is what will dictate your decision in this case. Thank you.
To preserve a complaint about improper jury argument for appellate review, a defendant must object and pursue the objection to an adverse ruling. Cockrell v. State , 933 S.W.2d 73, 89 (Tex. Crim. App. 1996). A defendant must object at the earliest opportunity to prevent waiver of an issue on appeal. Yazdchi v. State , 428 S.W.3d 831, 844 (Tex. Crim. App. 2014) (citing Wilson v. State , 71 S.W.3d 346, 349 (Tex. Crim. App. 2002) ). A defendant forfeits his complaint about improper jury argument if he fails to object each time such argument is made. Valdez v. State , 2 S.W.3d 518, 521-22 (Tex. App.-Houston [14th Dist.] 1999, pet. ref'd).
Here, Owens did not object when the prosecutor made the complained-of statements that Owens was "aware that his conduct could kill people" and "knew what he was doing." Thus, Owens did not object to the propriety of the State's closing argument "at the earliest opportunity." See Yazdchi , 428 S.W.3d at 844. When Owens did object, he failed to pursue his objection to an adverse ruling. See Cockrell , 933 S.W.2d at 89. Accordingly, he has not preserved this issue for appellate review. See Tex. R. App. P. 33.1(a). We overrule Owens's second issue.
District court's denial of Owens's requested voir dire question
In his third issue, Owens complains that the district court erred by sustaining the State's objection to his proposed voir dire question, which read: "On a scale of one to seven with one being strongly agree and seven being strongly disagree, how would you answer the following question: I will always believe that a person that drove recklessly knew that he could kill someone."
"A trial court has broad discretion over the voir dire process, including setting reasonable limits and determining the propriety of a particular question." Samaripas v. State , 454 S.W.3d 1, 5 (Tex. Crim. App. 2014). In this context, a trial court abuses its discretion only when a proper question about a proper area of inquiry is prohibited. Id. A voir dire question is proper if it seeks to discover a juror's views on an issue applicable to the case. Barajas v. State , 93 S.W.3d 36, 38 (Tex. Crim. App. 2002). But an otherwise proper question is impermissible if the question attempts to commit the juror to a particular verdict based on particular facts. Id. at 38. Voir dire questions that are not intended to discover bias against the law or prejudice for or against the defendant, but rather seek only to determine how jurors would respond to the anticipated evidence and commit them to a specific verdict based on that evidence, are improper. Sanchez v. State , 165 S.W.3d 707, 712 (Tex. Crim. App. 2005) (citing Standefer v. State , 59 S.W.3d 177, 180 (Tex. Crim. App. 2001), noting that commitment questions are improper when law does not require commitment and question could not disqualify juror for cause or when question includes facts in addition to those necessary to establish challenge for cause).
"[A] question is a commitment question if one or more of the possible answers is that the prospective juror would resolve or refrain from resolving an issue in the case on the basis of one or more facts contained in the question." Standefer , 59 S.W.3d at 180 ; Garner v. State , 523 S.W.3d 266, 277 (Tex. App.-Dallas 2017, no pet.). Generally, a commitment question will elicit a "yes" or "no" answer, but "an open-ended question can be a commitment question if the question asks the prospective juror to set the hypothetical *745 parameters for his decision-making." Standefer , 59 S.W.3d at 180.
Here, Owens's proposed question attempted to commit the venire to resolving the culpable-mental-state issue based on a fact contained in the question, i.e., that a person drove recklessly. This question was improper because it sought only to determine how jurors would respond to the anticipated evidence about the nature of Owens's driving and to commit them to a specific verdict about his culpable mental state based on that evidence. See Sanchez , 165 S.W.3d at 712. We conclude that the district court did not abuse its discretion in sustaining the State's objection to the proposed voir dire question. Owens's third issue is overruled.
District court's denial of Owens's requested jury-charge instruction
In his fourth and final issue, Owens complains that the district court erred by denying his requested jury-charge instruction to the jury. During the charge conference, Owens requested the addition of an instruction indicating that the jury "can basically consider all relevant evidence, including evidence of relationships between parties and anything that would go to show the defendant's state of mind at the time." Owens stated that his requested instruction was based on Article 38.36(a) of the Texas Code of Criminal Procedure, which provides:
In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.
Tex. Code Crim. Proc. art. 38.36(a). The district court denied Owens's requested instruction, explaining:
First of all, I think that really has to do with the admission of evidence, and I don't think that would really be appropriate for the charge. I think that obviously they can consider all of the evidence and that really has more to do with the admissibility of evidence, and there is evidence before this jury considering the defendant's state of mind based on statements that he made when he was in police custody, and certainly you can argue that they can consider that, but I don't think it needs to be in the charge.
Consistent with the court's explanation, Texas courts have held that Article 38.36(a) is a rule of evidence, that trial courts are not required to give such an instruction to the jury, and that it is not reversible error for a trial court to refuse to give such an instruction. Milner v. State , 262 S.W.3d 807, 809 (Tex. App.-Houston [1st Dist.] 2008, no pet.) ; Roberson v. State , 144 S.W.3d 34, 41-42 (Tex. App.-Fort Worth 2004, pet. ref'd) ; see Roberts v. State , No. 06-16-00082-CR, 2017 WL 2961473, at *7-8, 2017 Tex. App. LEXIS 6353 at *19-20 (Tex. App.-Texarkana July 12, 2017, pet. ref'd) (mem. op., not designated for publication). Because inclusion of an Article 38.36(a) instruction was not required, the district court did not err by denying Owens's request to add it to the charge. We overrule Owens's fourth issue.
Modification of judgment
Our review of the record shows that Owens's judgment of conviction incorrectly states that his offense was a first-degree felony. Appellate courts have authority to modify incorrect judgments when the necessary information is available *746 to do so. See Tex. R. App. P. 43.2(b) ; Bigley v. State , 865 S.W.2d 26, 27 (Tex. Crim. App. 1993) ; Asberry v. State , 813 S.W.2d 526, 529 (Tex. App.-Dallas 1991, pet. ref'd) ("Appellate courts have the power to reform whatever the trial court could have corrected by a judgment nunc pro tunc where the evidence necessary to correct the judgment appears in the record."). Accordingly, we modify Owens's judgment of conviction to reflect that his "Degree of Offense" was a capital felony.
CONCLUSION
We modify the district court's judgment of conviction to reflect that the "Degree of Offense" was a capital felony, and we affirm the judgment as modified.