In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-19-00010-CR**
_____


**KELVIN LEE ROY, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 163rd District Court
Orange County, Texas
Trial Cause No. B140221-R

**MEMORANDUM OPINION**

Kelvin Lee Roy appeals his murder conviction. *See* Tex. Penal Code Ann. § 19.02(b)(2). In two issues, Roy argues 1) the evidence was legally insufficient to demonstrate that he intended to cause serious bodily injury and intentionally committed a dangerous act, and 2) the evidence only supports that he was guilty of manslaughter, not murder. For the reasons explained below, we affirm as modified.

1

## Background

As Roy confines our legal sufficiency review to whether the evidence was sufficient to demonstrate his intent to commit murder under Penal Code section 19.02, we limit our discussion to the witness testimony relevant to that issue.

On February 7, 2014, fourteen-year-old A.B. and her mother were in the family's van driving southbound on Main Street in Vidor, Texas, when they stopped on the downward decline of a railroad crossing for a red stoplight.[1] The decline at the railroad crossing was such that only one car could be on the downward decline if a red light had stopped traffic. At the same time, Roy, driving a sedan southbound on Main Street in Vidor, struck the rear of the van with such force that it essentially destroyed the van on the passenger side, causing A.B. to be ejected from the van in the collision. Roy's sedan landed upside down when it finally stopped. A.B. died from the injuries she received in the collision. Roy had minor injuries. But his passenger and girlfriend, T.B., was hospitalized for two months due to the injuries she suffered in the collision.

T.B. testified that on February 7, 2014, she and Roy left their home late in the evening to get T.B. dinner at a fast food restaurant in Beaumont, Texas. T.B. testified

---

[1] We refer to the victims and their family members with pseudonyms or initials to conceal their identity. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

that the quickest route to the fast food restaurants from their home was via Interstate 10; however, Roy passed the exit and continued travelling east on Interstate 10, toward Vidor. T.B. explained that she questioned Roy about missing his exit. In response, he told her to "shut the F up." After that, Roy then took out a "dip cigarette[,]" which he smoked.[2]

At that point, T.B. began asking Roy to pull over and get off the freeway. Roy ignored her requests. According to T.B., Roy was driving slowly and drifting between lanes. She feared they were going to get run over. T.B. testified that Roy was acting like a crazy person, laughing, and repeating the phrase "one deep[.]" Scared, T.B. lowered her window and began screaming for help. T.B. then told Roy she did not want to continue their relationship because she was tired of his "disrespect[]" and him doing "stupid things[.]"

Roy sped up. He took the exit onto Main Street in Vidor and entered the feeder road. T.B. pleaded with Roy to pull over, but he looked at her and said "shut the F up[,]" and "that he'll kill me, he'll kill both of us[.]" Roy sped up again, merging into the southbound lane on Main Street. T.B testified she could see cars stopped ahead at a stop light "over a train track hill[.]" She begged Roy to slow down. Roy just looked at her, "mashed" the gas, and the sedan flew over the train tracks,

---

[2] It was explained at trial that a "dip" or "dipped" cigarette is a cigarette that has been dipped in Phencyclidine, otherwise known as PCP.

crashing into the van. According to T.B., their car "dived" into the van stopped at the train crossing, then flipped several times. She also testified Roy never slowed down or applied his brakes before crashing into the van.

On cross examination, T.B. testified that Roy was acting normally before smoking the dipped cigarette, but that afterwards, he did not seem rational. She described that she had seen Roy use PCP on other occasions, but she had never seen him rendered "unconscious" after using PCP.

Michael Stephenson, who was also driving in the eastbound lanes of Interstate 10 on the day Roy struck the van, observed Roy's sedan in the eastbound traffic on Interstate 10. Stephenson explained traffic in the eastbound lanes began backing up as he approached Vidor. He noticed Roy's sedan in the left-hand lane, travelling around 45 miles per hour, and being driven on the shoulder of the highway. Then, the sedan crossed three lanes of Interstate 10, onto the other side of the highway. Stephenson testified the sedan was being driven recklessly. He also stated that he called the police and reported what he had seen.

Joshua Bryan testified that he was traveling southbound on Main Street when he saw the sedan collide with the van. According to Bryan, he was a passenger in a vehicle being driven by a coworker, which had stopped at a red light just north of the crossing. After the vehicle Bryan was in stopped near the crossing, Bryan noticed a "a car come (sic) speeding around us at - - I'm no expert but I'm going to say [Roy]

4

was doing 45, 50 miles an hour when he come around us." Roy's sedan, according to Roy, almost hit the curb after it passed them. Bryan testified that he never saw the brake lights on Roy's sedan and that he heard Roy revving the engine to the sedan when he went around them. According to Bryan, Roy never tried to stop before he hit the van; instead, based on what Bryan said he saw, Roy "hit the gas instead of the brake."

Bryan's wife, Brittany Monroe, was also a passenger in the co-worker's car with Bryan when Roy's sedan struck the van. She testified that when Roy passed them, she noticed a "white flash . . . right beside us[,] . . . it was so fast[,] . . . I never saw any brake lights[.]"

Victoria Andis, a witness who stopped to help the people whose vehicles had been involved in the crash, testified she approached the van. She explained that she saw T.B. trying to crawl out the sedan's window. According to Andis, T.B. had a broken leg, and she seemed to be scared and emotional. T.B. told Andis that Roy was under the influence of "something[,]" and he was trying to kill them. On cross examination, Andis agreed she gave police a signed statement shortly after the crash in which she had not disclosed that T.B. said he was trying to kill them. But Andis did tell police during her statement that Roy was driving crazy, was mad, and that he was under the influence.

Clint Aslin testified that he was part of a two-man paramedic team that took Roy to the hospital that night. He testified that Roy had no visible "real injuries[,]" except for a small laceration above his eye and a hematoma on his forehead. Roy appeared lethargic but he did respond to "painful stimuli." He explained T.B. said she did not want the paramedics to take her to the same hospital where they took Roy because he had just tried to kill her. Emergency responders took Roy to the hospital in a separate ambulance. Aslin explained that he was in the ambulance emergency responders used to take Roy to the hospital. He inserted two "large bore IVs, 18 gauge IVs in both [of Roy's] arms." Roy began to wake up on the way to the hospital and became combative. Roy pulled out both of his IVs, and he told Aslin he was not going to the hospital and that he was God. Aslin explained the emergency responder driving the ambulance pulled over and came to help him chemically sedate Roy so he could be taken safely to the hospital. Aslin testified he could not determine whether Roy's behavior resulted from ingesting an intoxicant or an injury to his head.

While on cross examination, Aslin testified that he is familiar with substances like PCP. He described it as a substance that makes some people act irrationally, super-aggressive, and may cause an individual to suffer from hallucinations. While Aslin acknowledged he had never encountered anyone rendered "unconscious" from haven taken PCP, PCP results in a "different altered level of consciousness."

6

Richard Howard testified that he is the patrol captain for the Orange County Sheriff's Department. Before working for the Orange County Sheriff's Department, Howard worked for the Texas Department of Public Safety, where, for 22 years, he participated in a "crash reconstruction team." Howard stated that he participated in the investigation and reconstruction of the collision between Roy's sedan and the van. Based on what he learned in the investigation, Howard expressed his opinion that Roy's sedan struck the van with an "extreme amount of force." Howard agreed, however, he could not determine from his investigation how fast Roy was traveling just before the crash occurred. But he still felt that excessive speed was one of the factors that led to the collision given the fact that the sedan left the ground as it crossed the train crossing and hit the van. He testified that for the car to be launched into the air, Roy's sedan was travelling at "either a constant speed or accelerat[ing]." Howard described that his investigation included reviewing photographs taken at the scene. He also spoke to the police officers who went to the scene about whether they had seen scuff or skid marks to indicate signs of braking marks, but he learned they saw none. He explained it is less likely to have a vehicle launched into the air if the driver brakes before impact. Howard also explained he only had one experience with one case involving an individual who had taken PCP. That person's behavior was "different[,] . . . [t]he behavior was aggressive with paranoia."

Roy testified in his own defense at trial. According to Roy, he and T.B. were driving to Vidor on February 7, 2014, to pay a man who repaired the brakes on T.B's vehicle. Roy explained that he went to Vidor, but then realized the mechanic was not home and left. Roy admitted that he smoked a cigarette laced with PCP after leaving the mechanic's home. Roy testified that after smoking the cigarette, he "began feeling like sick and light-headed, dizzy." Roy explained he felt as if he was losing consciousness. He also testified this is his normal reaction to PCP. He also testified about what he saw as he approached the railroad tracks on the night the collision occurred. He stated:

> As I approach the four-way stop sign, it's like I'm looking and I don't - - I don't know where I'm at. So, I'm like - - I tell [T.B.] - - I'm like I'm fixing to pull over and let her drive. So, I guess after that, that was the last thing I can remember telling her.

Roy testified he did not remember the crash, the ambulance ride to the hospital, or being at the hospital. According to Roy, he woke up in jail. He denied he was angry with T.B. and denied threatening to kill her.

At the conclusion of the guilt-innocence phase of the trial, the jury found Roy guilty of murder and sentenced him to eighty years of incarceration in the Texas Department of Criminal Justice. Roy filed a timely appeal.

**Standard of Review**

At trial, Roy did not dispute that he struck a van on February 7, 2014. He also did not dispute that the collision killed A.B. Instead, he argued he did not act

8

intentionally with respect to his conduct, which resulted in A.B.'s death. In his appeal, Roy argues the evidence is insufficient to support the jury's verdict that he knowingly or intentionally caused A.B.'s death. In reviewing a defendant's claim asserting the evidence in his trial does not support the verdict, we use a familiar standard of review. We review the evidence admitted in the trial in the light favoring the jury's verdict, and we decide whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We give deference to the jury's responsibility to fairly resolve conflicting testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13.

**Analysis**

A person commits the offense of murder if he:

> (1) intentionally or knowingly causes the death of an individual;
> (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual; or
> (3) commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

*See* Tex. Penal Code Ann. § 19.02(b). The indictment in this case alleged that Roy

> on or about February 7, 2014, . . . did then and there intend to cause serious bodily injury to an individual, [T.B.], and did then and there intentionally commit an act which was clearly dangerous to human life,

9

to wit: driving a vehicle in which the said [T.B.] was a passenger into another vehicle causing the vehicles to collide which said act caused the death of [A.B.]

Whether the defendant acted while having the required mens rea, that is the state of mind required under a criminal statute to establish the defendant is guilty, is a question of fact that the jury decides from the direct and circumstantial evidence admitted during the defendant's trial. *Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003) (citing *Smith v. State*, 965 S.W.2d 509, 518 (Tex. Crim. App. 1998)). "Intent to murder can be inferred from circumstantial evidence such as a defendant's acts and words and the extent of the victim's injuries." *Gonzalez v. State*, No. AP-77,066, 2020 WL 6482409, at *22 (Tex. Crim. App. Nov. 4, 2020) (citations omitted). The Court of Criminal Appeals has explained that murder is a "result-of-conduct" offense, and the crime is defined by "one's objective to produce, or a substantial certainty of producing a specified result," i.e. death. *Louis v. State*, 393 S.W.3d 246, 251 (Tex. Crim. App. 2012) (*quoting Roberts v. State*, 273 S.W.3d 322, 329 (Tex. Crim. App. 2008), *abrogated in part on other grounds by Ex parte Norris*, 390 S.W.3d 338, 341 (Tex. Crim. App. 2012). "Mental culpability is a question of fact to be determined by the jury from all the facts and circumstances in evidence." *Walter v. State*, 581 S.W.3d 957, 973 (Tex. App.—Eastland 2019, pet. ref'd) (citing *Hemphill v. State*, 505 S.W.2d 560, 562 (Tex. Crim. App. 1974)). "Intent is of such a nature that it is most often proven through circumstantial evidence surrounding the

crime." *Id.* (citing *Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991), *overruled on other grounds by Fuller v. State*, 829 S.W.2d 191 (Tex. Crim. App. 1992). Under Penal Code section 19.02(b)(2), intent to kill is not required, and the State meets its burden if the evidence shows that the defendant intended to cause serious bodily injury or commit a dangerous act. *Ramirez v. State*, 229 S.W.3d 725, 729 (Tex. App.—San Antonio 2007, no pet.) (citations omitted).

Viewed in the light most favorable to the verdict, the evidence supports the jury's conclusion that Roy intended to cause serious bodily injury and committed an act clearly dangerous to T.B.'s life, which caused A.B.'s death. While Roy testified he could not remember much after he smoked a cigarette dipped in PCP, and that he was not trying to kill T.B., the jury could have reasonably decided not to have to believe him. *See Gilbert v. State*, 575 S.W.3d 848, 859–60 (Tex. App.—Texarkana 2019, pet. ref'd) (citations omitted) ("The jury is also the sole judge of the credibility of the witnesses and the weight to be given their testimony and may 'believe all of a witness['] testimony, portions of it, or none of it.'"). The jury was free to believe T.B.'s testimony that Roy became irrational after smoking a cigarette dipped in PCP, said he wanted to kill T.B., and that he began driving in a way clearly dangerous to human life. *See id.* at 860 (noting that we give almost complete deference to the jury's determination of credibility). The jury also heard testimony from several eyewitnesses who testified they heard Roy's sedan accelerating before flying over

the railroad track, he never applied apply his brakes, and he did not slow down. *See Owens v. State*, 549 S.W.3d 735, 742 (Tex. App.—Austin 2017, pet. ref'd) (affirming the jury's finding that the appellant intentionally committed murder because the appellant actions such as driving his car into a group of people, never applying his brakes, and "increasing his speed as he drove" were reasonably certain to cause death).

From this evidence, as well as Roy's own testimony acknowledging that he was aware that smoking PCP typically caused him to lose consciousness, the jury could have rationally found Roy intended to cause another a serious bodily injury and that his conduct was clearly dangerous to human life. *See* Tex. Penal Code Ann. § 19.02(b)(2); *see also Alami v. State*, 333 S.W.3d 881, 888 (Tex. App.—Fort Worth 2011, no pet.) (explaining that a rational jury could find that the appellant committed an act dangerous to human life when he drove at an excessive speed and collided with another car, ultimately causing the death of his passenger).

### Conclusion

Based on the standard of beyond reasonable doubt, we conclude the jury, from the evidence admitted in Roy's trial, could rationally find Roy guilty of murder. *See Jackson*, 443 U.S. at 319. Having considered Roy's arguments, we overrule his first issue, in which he argues the evidence is insufficient to support the verdict. Given our resolution of Roy's first issue, we need not address his other issue, in which he

12

argues the evidence supports only a finding of manslaughter. *See* Tex. R. App. P. 47.1.

While we affirm Roy's conviction, we note neither Roy's indictment nor the judgment recite the correct section number of the Penal Code that is relevant to Roy's conviction for murder. Neither party brought this error to the Court's attention.

Roy's indictment identifies Roy and his crime, and the indictment tracks the statutory language. Thus, Roy was on notice of the crime the State charged him with having committed. *See id*. For that reason, the fact the judgment does not recite the correct version of the Penal Code is a clerical error that we may correct so the judgment reflects the Penal Code provision that the jury found Roy violated. *See* Tex. R. App. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27 (Tex. Crim. App. 1993) (stating this Court has the authority to reform the trial court's judgment to correct clerical errors). We modify the judgment in Roy's case by striking the section "19.02" and inserting "19.02(b)(2)" in its stead. As modified, the trial court's judgment is affirmed.

AFFIRMED AS MODIFIED.

_____
CHARLES KREGER
Justice

13

Submitted on April 30, 2020
Opinion Delivered December 16, 2020
Do Not Publish

Before Kreger, Horton, and Johnson, JJ.