# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-23-00405-CR

---

**Daniel Carcamo, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 460TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-DC-19-300474, THE HONORABLE SELENA ALVARENGA, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Daniel Carcamo was charged with the offenses of aggravated assault with a deadly weapon and assault family violence by impeding breathing or circulation. *See* Tex. Penal Code §§ 22.01, .02. The jury found him guilty of both counts and assessed his punishment at thirteen years' imprisonment for the aggravated-assault conviction and ten years' imprisonment for the assault-family-violence conviction, and the trial court rendered its judgments of conviction consistent with the jury's verdicts. *See id.* §§ 12.33, .34. On appeal, Carcamo contends that the trial court erred by allowing extraneous-offense evidence during the State's rebuttal case and that the trial court erred by allowing victim-allocution statements to be made before his sentence was orally pronounced. We will modify one of the trial court's judgments of conviction to correct a clerical error, affirm that judgment as modified, and affirm the trial court's other judgment of conviction.

## BACKGROUND

On March 9, 2019, at approximately 3:00 a.m., a guest at an apartment in Austin, Texas, looked down at the pool deck of a nearby apartment complex and saw a man later identified as Carcamo "savagely assaulting" a woman, and the guest called the police. The guest observed that the woman became unconscious during the assault, that the man packed up his belongings before leaving the pool area, and that the woman later regained consciousness, started screaming, and appeared disoriented.

In response to the 911 call, multiple law-enforcement officers arrived at the apartment complex, searched for the woman in the complex, and found her in the parking garage. During her interaction with the police, the woman—Jessica Higgins (pseudonym)—appeared terrified and intoxicated and had injuries to her face, neck, and shoulder that were consistent with an assault. Higgins admitted that she had used illegal drugs earlier in the evening and related that the man—Carcamo—stated that he was going to kill her. The police contacted emergency medical services to have Higgins evaluated by a paramedic, and the paramedic observed that Higgins had bruising and broken blood vessels in her eyes, which were consistent with being strangled.

During their investigation, the police observed surveillance cameras nearby and obtained copies of the surveillance footage from that night. The police also arranged for a forensic examination of Higgins, and the nurse performing the exam noted that Higgins had injuries on her arms, right hip, right thigh, right knee, left leg, back, neck, chest, ribcage, abdomen, left ankle, left ear, lips, and jaw. The nurse also documented that Higgins had swelling under both of her eyes.

The police ultimately arrested Carcamo at his apartment. Carcamo was charged with aggravated assault and assault family violence by impeding breathing or circulation. During the trial, the State called the following witnesses who testified regarding the events discussed above: responding and investigating police officers, the guest at the nearby apartment complex who reported the incident to the police, one of Higgins's friends, the paramedic and forensic nurse who evaluated Higgins, and Higgins. In addition, the following exhibits were admitted: photos of Higgins's injuries, body camera footage of Higgins's interaction with the police, and surveillance footage of the incident from the cameras on the pool deck.

During her testimony, Higgins explained that she had been dating Carcamo for three or four months at the time of the incident, that they went to a concert hours before the incident, and that they took ecstasy at the concert. Higgins related that Carcamo was not in a great mood, that he expressed that he was upset because of how she had talked with other men at the concert, that they left the show early, and that they went back to his apartment. Further, she recalled that after they made it to the apartment, they took LSD and headed to the complex's pool. In response, she testified regarding how after they began kissing, she became overheated and uncomfortable, pushed him away, and got out of the pool.

Additionally, she described how Carcamo became angry, got on top of her, held her down, bit her shoulder, "hump[ed her] through shorts," chewed on her ears by "fully clamp[ing] down on the cartilage of [her] ears and gr[inding] his teeth," called her names, told her "to shut the fuck up" when she begged him to stop, ripped her hair out of her head, and placed his hands on her neck and applied pressure, causing her to go in and out of consciousness multiple times. She recalled feeling tremendous pain and stated that he threatened during the incident to kill her and her entire family if she mentioned anything about what he was doing.

3

Finally, she testified that she remembered losing consciousness one last time, being alone when she regained consciousness, leaving the pool area, and screaming for help.

During her cross-examination, Higgins testified that she had taken LSD with Carcamo three or four times before. Regarding the events leading up to the incident, Higgins testified that Carcamo was acting bizarrely at the concert by insisting that she had talked with men that did not exist and that she was concerned that his behavior was caused by his having taken LSD, but she related that Carcamo and she had talked and kissed when they returned to the apartment and went to the pool and that Carcamo was not angry when they first went to the pool. Higgins also explained that Carcamo had never chewed on her ears before.

The surveillance footage of the incident is consistent with Higgins's testimony and showed an assault lasting an hour in length, showed her losing and regaining consciousness multiple times, and showed her turning blue after she stopped breathing for an extended period. The footage also captured Carcamo gathering his belongings and leaving the pool area while Higgins was still lying on the pool deck.

During his case-in-chief, Carcamo called as witnesses the girlfriend of a young man who died at the same apartment complex two months before the incident in question, the young man's father, and a police officer, and Carcamo also elected to testify. The girlfriend of the young man stated that her boyfriend and she regularly took LSD and that her boyfriend had never been violent towards her. Next, she described how they took LSD on January 5, 2019, after obtaining it from someone living in Carcamo's apartment complex and how her reaction to the drug did not seem consistent with her prior experience with LSD. Further, she stated that her boyfriend started screaming, saying things that did not make sense, and hitting people, including her, before taking off his clothes and jumping off the eighteen-story building. Consistent with

4

that testimony, the young man's father testified that his son had never been violent towards his girlfriend or anyone else prior to that evening. The police officer called by Carcamo explained that illegal drugs can have other substances added to them that the user might not know about.

In his testimony, Carcamo explained that he had taken LSD over fifty times before the night in question, that he had never hallucinated while taking LSD before, and that he took ecstasy and what he thought was LSD on the night in question. He testified that he thought that Higgins was talking with other men at the concert, but he acknowledged that the drugs might have caused him to hallucinate her interactions with other men. Further, Carcamo recalled that the LSD was not having the usual effect on him, so he took five or six tabs of LSD over a one-and-a-half-hour period after Higgins and he returned to his apartment. Although Carcamo explained that he remembered going to the pool, he had no memory of what happened at the pool and woke up on a bench near his apartment complex. When discussing what he had learned about the incident, Carcamo stated that he had never behaved like that before and did not intentionally, knowingly, or recklessly hurt Higgins. Carcamo explained that he believed that he had been given drugs that were not LSD and that taking those drugs caused a bad reaction like what had happened to the young man who had jumped from his building.

After Carcamo finished calling his witnesses, the State recalled Higgins as a rebuttal witness. In her testimony, Higgins explained that prior to the incident in question, she had a sexual encounter with Carcamo in which he lost control and said that during this earlier incident, he squeezed her neck with his hands "to the point that [she] was getting uncomfortable and [she] lost consciousness." Further, she testified that when she regained consciousness, he "was still on top of [her] and he was laughing."

5

After considering the evidence presented at trial, the jury found Carcamo guilty of the two charged offenses. During the punishment phase, Higgins testified about another incident that occurred while Carcamo and she had taken LSD and ecstasy. Specifically, she related that after she agreed to be handcuffed during a sexual encounter, Carcamo told her that he was going to have anal intercourse with her, but she explained that she told him that she did not want to do that, begged Carcamo to let her leave, and began sobbing. Moreover, Higgins testified that Carcamo continued to have vaginal intercourse with her despite her crying and begging to be let go, and she described how her arms were bruised by her efforts to get away from him.

Next, Higgins related that she obtained protective orders after the incident for which Carcamo was arrested in this case and that he violated the orders by calling her, texting her, and sending her packages and letters in the mail. Further, she recalled that in one text message, Carcamo told her that he was coming to see her at the hospital where she was studying to be a nurse. Next, she explained that she called the police. One of the police officers who responded to Higgins's 911 call testified that the police found Carcamo on the roof of a building near the hospital and arrested him for violating the protective orders. Two correctional officers testified that he assaulted the officers while in jail on different days by biting the first officer and by grabbing the second officer's throat with enough pressure to cause the officer's windpipe to collapse.

Carcamo called his mother and a psychologist as witnesses. His mother testified that he did not appear to be acting like himself after the incident, deteriorated even further while in jail, had incoherent thoughts, and was paranoid that people were trying to plot against him. Carcamo's mother recalled that Carcamo was arrested for assaulting his father but that he became more stable later. The psychologist testified that Carcamo was diagnosed with

6

schizophrenia after the incident in question, began taking medicine to treat his condition, and had been consistently taking the medicine for years. Finally, Carcamo testified that he was sorry for his actions, that strangulation had been part of his sex life with Higgins, that he never raped Higgins, and that he never hit Higgins before the incident. When discussing his behavior around the time of the incident, Carcamo explained that he did not have control over his mental health, but he explained that he feels like himself again now that he is stabilized on medication.

After considering the evidence, the jury assessed Carcamo's punishment, and the trial court announced the jury's verdicts. The trial court then explained to the jury that Higgins or members of her family would be making an allocution and excused the jury. Following the allocution, the trial court pronounced its sentences consistent with the jury's verdicts. After preparing the written judgments of conviction, the trial court issued a judgment nunc pro tunc for the aggravated-assault conviction to correct an error in the number of days for which Carcamo received jail time credit.

Carcamo appealed the trial court's judgments of conviction.

## DISCUSSION

In his first issue on appeal, Carcamo contends that the trial court erred when it allowed the State to call Higgins as a rebuttal witness to testify regarding an extraneous offense. In his second issue, he argues that the trial court erred when it allowed the victim allocution to occur before it orally pronounced his sentence.

**Rebuttal Extraneous Offense**

When presenting his first issue, Carcamo notes that in his opening statement during the guilt-innocence phase, he argued that something was wrong with the LSD that he

7

consumed on the night in question and that the drugs caused his strange behavior. Next, he emphasizes that despite his making the defensive claim in his opening, the State made no effort to introduce extraneous-offense evidence to rebut the defensive theory and instead waited until after he took the stand to offer the evidence in rebuttal. Although Carcamo acknowledges that the State may call rebuttal witnesses to address issues raised by the defense during its case and that the Rules of Evidence allow for the admission of extraneous-offense evidence to rebut a defensive theory, he asserts that the State should not be allowed to call a rebuttal witness to testify regarding an extraneous offense for the purpose of rebutting a defensive theory when the State becomes aware of the defensive theory through opening statements but chooses not to present any evidence to challenge that defense before the defendant begins his case. Instead, he argues that the State should try to rebut the defensive theory through extraneous-offense evidence before the defendant begins his case. Carcamo contends that allowing the State to present its extraneous-offense evidence in the manner done in this case violated "basic due process" and was an error "of constitutional magnitude."

When presenting this claim, Carcamo does not cite to any constitutional provision, case law, or other legal authority as support for the idea that his due-process rights were violated by the procedure undertaken in this case. *See* Tex. R. App. P. 38.1(i) (requiring brief to contain appropriate citations to authorities); *Lucio v. State*, 351 S.W.3d 878, 896 (Tex. Crim. App. 2011) (determining that claim was "inadequately briefed and present[ed] nothing for review"). Although Carcamo generally references due process, that type of assertion, "with nothing else, is conclusory" and "is not enough to support reversal." *Bohannan v. State*, 546 S.W.3d 166, 179, 180 (Tex. Crim. App. 2017); *see Bell v. State*, 90 S.W.3d 301, 305 (Tex. Crim. App. 2002) ("It is not sufficient that appellant raise only a general constitutional doctrine

8

in support of his request for relief."). Even when making a novel argument that has no authority directly on point, an appellant must still "ground his contention in analogous case law or provide the Court with the relevant jurisprudential framework for evaluating his claim." *Chuong Duong Tong v. State*, 25 S.W.3d 707, 710 (Tex. Crim. App. 2000).

Because Carcamo did not "provide any relevant authority suggesting how the judge's actions violated" his due-process "rights, we find the issue to be inadequately briefed." *See id.*; *see also Bohannan*, 546 S.W.3d at 180 (determining that novel due-process argument was inadequately briefed).[1]

Accordingly, we overrule Carcamo's first issue on appeal.

**Victim Allocution**

In his second issue, Carcamo contends that the trial court erred by allowing victim-allocution statements before his punishments were orally pronounced. Although the allocution happened after the jury determined his sentences and after the jury's verdicts were read, Carcamo contends that the trial court's actions were erroneous because the governing statute requires that victim-allocution statements occur after sentence is pronounced. *See* Tex. Code Crim. Proc. art. 42.03, § 1(b). Further, he argues that "but for the victim impact statement taking place before the sentence pronouncement," "[t]here is a possibility that [his] sentence could have been vacated or the court could have found grounds for a new trial." Although Carcamo acknowledges that the record does not contain any objection to the untimely allocution, he notes that the governing statute prohibits victim-allocution statements from being transcribed, *see id.*, and that consistent with that directive, the allocution in this case was not transcribed. For

---

[1] We note that we have been unable to find authority supporting Carcamo's suggestion that his due process rights were violated by the procedure undertaken in this case.

that reason, Carcamo contends that it is possible that an objection was made during the allocution but simply not recorded.

Prior to the allocution in this case, the trial court made the following statements when excusing the jury:

> At this time, the instructions that I have previously given to you no longer apply. So you can speak to anyone that you wish or not speak to anyone if you wish -- if you do not wish to do so.
>
> There is going to be an allocution. That is a statement given by either the victim or a member of the victim's family. You are welcome to remain in the courtroom if you wish, or you can go back to your jury room.
>
> I would like to go back there and just speak with you briefly. But it is completely up to you as to whether or not you wish to remain. I know that you are tired, that it has been a long day, a long week. So again, it's completely up to you if you want to wait.
>
> Also, the lawyers might want to speak with you.
>
> You can speak to them if you wish. You do not have to speak to them.
>
> All right. So at this time, if y'all wish to remain there, you can do so. Let's go ahead and do the allocution.

As conceded by Carcamo, he did not object on the record prior to the allocution, and as shown above, he had an opportunity to do so. Carcamo also did not object following the allocution when the case went back on the record. Generally, before a party may present "a complaint for appellate review, the record must show that . . . the complaint was made to the trial court by a timely request, objection, or motion" "with sufficient specificity to make the trial court aware of the complaint." *See* Tex. R. App. P. 33.1(a). "Preservation of error is a systemic requirement" on appeal. *See Darcy v. State*, 488 S.W.3d 325, 327 (Tex. Crim. App. 2016). An issue raised on appeal generally must be preserved by a specific objection at trial. *Resendez v.*

10

*State*, 306 S.W.3d 308, 312 (Tex. Crim. App. 2009). Accordingly, to preserve a complaint on appeal, the party must make a specific objection letting the trial court "know what he wants, why he thinks himself entitled to it, and do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it." *Id.* at 312-13 (quoting *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992)); *see Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009). Appellate courts should not address the merits of an issue that has not been preserved for appellate consideration. *See Blackshear v. State*, 385 S.W.3d 589, 591 (Tex. Crim. App. 2012).

Although Carcamo postulates that it is possible that an objection was made during the unrecorded allocution and that this Court should therefore address the issue, appellate courts do not presume error from a silent record, and the appealing party has the burden to present a record showing that an error was properly preserved. *See Word v. State*, 206 S.W.3d 646, 651-52 (Tex. Crim. App. 2006). Because the record before this Court shows that Carcamo did not object to the untimely allocution despite having the opportunity to do so and did not ask the record to reflect any off-the-record objection during the allocution when the case went back on the record, we conclude that the error has not been preserved for appellate consideration. *See Mayo v. State*, 861 S.W.2d 953, 954, 955 (Tex. App.—Houston [1st Dist.] 1993, pet. ref'd) (determining that appellant did not preserve complaint about victim making allocution before punishment had been assessed because he did not object to untimely allocution); *see also Cole v. State*, No. 02-22-00040-CR, 2022 WL 16646410, at *2 (Tex. App.—Fort Worth Nov. 3, 2022, pet. ref'd) (mem. op., not designated for publication) (overruling issue alleging that trial court erred by hearing allocution statements before "pronouncing his sentence" because defendant "failed to raise any objection to the victim-allocution statements").

11

For these reasons, we overrule Carcamo's second issue on appeal.

**Clerical Error**

In its appellee's brief, the State contends that error in the nunc pro tunc judgment of conviction for the aggravated-assault count requires correction. Specifically, the State highlights that the degree of offense listed for the conviction was a third-degree felony but notes that aggravated assault as charged in this case is a second-degree felony.

We agree with the State. The indictment in this case alleged that the aggravated assault was a second-degree felony, and the indictment alleged that Carcamo "did then and there intentionally, knowingly, and recklessly cause bodily injury" to Higgins while "us[ing] and exhibit[ing] a deadly weapon, to-wit: said Defendant's hand, arm, torso, leg, and body, during the commission of the assault." This type of aggravated assault is a second-degree felony. *See* Tex. Penal Code § 22.02(b). The jury charges for the guilt-innocence and punishment phases pertaining to this offense were consistent with a second-degree felony, and the thirteen-year punishment assessed for this offense was authorized for second-degree felonies but not third-degree ones. *See id.* §§ 12.33., .34.

Appellate courts have the authority to modify a trial court's judgment and affirm it as modified. *See* Tex. R. App. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27-28 (Tex. Crim. App. 1993). In fact, "[a]ppellate courts have the power to reform whatever the trial court could have corrected by a judgment nunc pro tunc where the evidence necessary to correct the judgment appears in the record." *Morris v. State*, 496 S.W.3d 833, 836 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd) (quoting *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd)). This power extends to modifying the degree of the offense listed in a

judgment of conviction. *See Owens v. State*, 549 S.W.3d 735, 746 (Tex. App.—Austin 2017, pet. ref'd).

Accordingly, we modify the nunc pro tunc judgment for Carcamo's conviction for aggravated assault to reflect that the offense was a second-degree felony.

## CONCLUSION

Having overruled both of Carcamo's issues on appeal but having determined that the nunc pro tunc judgment of conviction for aggravated assault contained a clerical error, we modify that judgment of conviction to reflect that Carcamo was convicted of a second-degree felony, affirm that judgment as modified, and affirm the trial court's other judgment of conviction for assault.

_____

Thomas J. Baker, Justice

Before Justices Baker, Triana, and Kelly

Count 1: Modified and, as Modified, Affirmed

Count 2: Affirmed

Filed: August 1, 2024

Do Not Publish

13