# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-23-00367-CR

**Vincent Charles Favata, III, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE 453RD DISTRICT COURT OF HAYS COUNTY
### NO. CR-20-0199-C, THE HONORABLE SHERRI TIBBE, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted Vincent Charles Favata, III, of two counts of aggravated assault with a deadly weapon (Counts I and III).[1]  *See* Tex. Penal Code § 22.02(a)(2).  In his sole appellate issue, Favata challenges the legal sufficiency of the evidence to sustain his convictions. Because we conclude that the evidence was sufficient, we affirm the trial court's judgments of conviction.

## BACKGROUND[2]

Shortly after 1:00 a.m. on December 17, 2019, gunshots were fired into a bar on the downtown square in San Marcos.  At the time, the bar was hosting a private party.  The

---

[1]   The jury also convicted Favata of deadly conduct, but the State abandoned the conviction during the trial's punishment phase.  *See* Tex. Penal Code § 22.05(b)(1) (providing that person commits offense if he knowingly discharges firearm at or in direction of occupied building).

[2]   The facts are taken from the evidence admitted during the jury trial.

shooter was in a vehicle across the street from the bar and shot multiple rounds into the bar. Wade Steger and Benjamin Nieuwoudt, who were inside the bar, were injured by gunshot wounds to their arms. Shortly before the shooting, the bar's front-door bouncer had forcibly escorted a man out of the bar. The bouncer described the man as Hispanic, 5'6" or 5'7", and "[m]aybe 38, 40, somewhere around there."[3] Earlier in the evening, the man had tried to enter the bar but was informed that he was not allowed to do so because it was hosting a private party. After the man was later noticed sitting at the bar, the bouncer asked the man to leave several times, but he refused to do so. After a "wrestling match" between the man and the bouncer, the bouncer forcibly escorted him out of the bar. During the encounter, the man's hat fell off. The bouncer then retrieved the hat from inside the bar and threw it out onto the sidewalk. A brief time after that, gunshots from a vehicle across the street were fired into the bar.[4]

A person who had been at a different bar in the area heard the gunshots and saw the "muzzle flash" coming from a "silver SUV" with "black rims" parked across the street from the bar. Another person who was on the same side of the street as the bar also saw the "muzzle flash" coming from a "newer Tahoe, silver" with "blacked out windows and rims" across the street. The police arrived within minutes of the shooting but were unable to locate the vehicle. By the time they arrived, the vehicle had been driven away.

---

[3] The bouncer also described the man as "pretty intoxicated."

[4] The evidence was conflicting at trial as to the length of time between the time that the bouncer escorted the man outside and when the gunshots were fired. A video recording shows that it was approximately one minute after the bouncer threw the hat out onto the sidewalk, but witnesses testified that the shooting occurred ten or fifteen minutes after the man was forcibly removed from the bar.

A few weeks later, the bouncer identified Favata in a photographic line-up as the man whom he had escorted out of the bar shortly before the shooting.[5]  In their investigation, the police also identified Favata as the registered owner of a vehicle that matched the "suspect vehicle," a license plate reader identified the vehicle as being driven "less than five minutes" from the bar at approximately 12:45 a.m. on December 17, and DNA testing connected Favata to the hat that the police recovered on the sidewalk outside of the bar after the shooting.  Favata's physical appearance also was consistent with witnesses' descriptions of the man who was involved in the incident with the bouncer, and although the police were unable to locate the firearm that was used in the shooting, they found an empty pistol holder at Favata's residence.

Favata was indicted on two counts of aggravated assault with a deadly weapon.  In Count I of the indictment, Favata was charged as follows:

> On or about the 17th Day of December, 2019, in Hays County, Texas, the Defendant, Vincent Charles Favata, III, did then and there intentionally, knowingly, or recklessly cause bodily injury to Wade Steger by Shooting Wade Steger, and the defendant did then and there use or exhibit a deadly weapon, to wit: firearm, during the commission of said assault.

The charge in Count III was the same except Benjamin Nieuwoudt was the named victim of the aggravated assault.

The jury trial occurred in April 2023.  The State's witnesses included officers who responded to the shooting, detectives who investigated the shooting, a DNA analyst, the bar's bouncer, individuals who were at the bar or nearby at the time of the shooting, and Wade Steger.  Favata's primary defense was that the State failed to prove beyond a reasonable doubt that he

---

[5]  At the time of the photographic line-up, the bouncer told the officer that he was 75% sure that the man he identified was the same man that he had escorted out of the bar shortly before the shooting.  At trial, the bouncer testified that he was "95 percent" sure.

3

was the man who committed the aggravated assaults. No witness testified that they saw Favata shooting a firearm into the bar, but the bouncer testified about his encounter with the man whom he escorted out of the bar and identified Favata as that man in court, and other witnesses' descriptions of the man's physical appearance were consistent with Favata's. The State also presented evidence that Favata's DNA was on the hat that the man had been wearing, the hat's logo was from a company at which Favata represented on Facebook that he had worked, the gunshots were fired from a silver SUV that was parked across the street from the bar, and a vehicle registered to Favata was observed in the area and matched the description of the suspect vehicle.

The exhibits included the 911 call notifying the police of the shooting, video recordings from responding officers' body cameras,[6] photographs, video footage from other businesses in the area showing a SUV driving after the shooting and then parked in the parking lot of a nearby restaurant, the photographic line-up with its instructions, and the laboratory report of the DNA analysis that connected Favata to the hat.[7] The photographs were of the victims' injuries; damage to the bar, including a shattered window at the front of the bar; bullet fragments

---

[6] The video recordings did not include audio.

[7] The DNA laboratory report concluded:

> The DNA profile from this item is interpreted as originating from a single male individual. The probability of this profile if the DNA came from Vincent Favata III is 998 sextillion times greater than the probability of this profile if the DNA came from an unrelated, unknown individual. The likelihood ratio indicates support for the proposition that Vincent Favata III is a possible contributor of the profile.

The bouncer was "excluded as the contributor of this profile."

4

and projectiles recovered from inside and outside the bar; bullet casings recovered from across the street where the vehicle had been parked; the hat on the sidewalk outside the bar; the vehicle registered to Favata parked in front of his residence; a compartment in his vehicle's center front console; and still shots of the vehicle, its license plate, and its driver from the video recorded in the parking lot of the nearby restaurant a few minutes after the shooting. In the video, the vehicle pulls into a parking space, and although the captured images are not entirely clear, the driver's face and hands can be seen. The driver appears to be holding a handgun, removing and re-inserting the handgun's magazine, and then placing it forward into the console area of the vehicle.[8] The vehicle stays parked for several minutes and then drives away.

The jury found Favata guilty of both counts, and following a punishment hearing in June 2023, the trial court assessed punishment at ten years' confinement for each count, with the sentences to run concurrently. Consistent with the jury's verdict and its assessed punishments, the trial court signed the judgments of conviction. Favata filed a motion for new trial, which was overruled by operation of law. This appeal followed.

## ANALYSIS

**Standard of Review**

Favata challenges the legal sufficiency of the evidence to support his convictions. In determining the sufficiency of the evidence to support a conviction, we must decide after

---

[8] When asked what appeared to be happening on the video, a detective testified as follows:

> The person in the driver's seat is manipulating what appears to me to be a handgun, removing the magazine, and reaching forward and eventually re-seating the magazine and then placing the weapon forward apparently into, like, a compartment of the vehicle.

viewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020). We "view the evidence in the light most favorable to the verdict and consider all of the admitted evidence, regardless of whether it was properly admitted." *Stahmann*, 602 S.W.3d at 577. "'Direct evidence and circumstantial evidence are treated equally,' and 'circumstantial evidence alone can be sufficient to establish guilt.'" *Dunham v. State*, 666 S.W.3d 477, 482 (Tex. Crim. App. 2023) (quoting *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)); *see Kibble v. State*, 340 S.W.3d 14, 18 (Tex. App.—Houston [1st Dist] 2010, pet. ref'd) (explaining that "circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor"). "In circumstantial-evidence cases, each fact need not point directly and independently to the actor's guilt as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Harmel v. State*, 597 S.W.3d 943, 953 (Tex. App.—Austin 2020, no pet.) (citing *Owens v. State*, 549 S.W.3d 735, 741 (Tex. App.—Austin 2017, pet. ref'd)).

We also are mindful that "[t]he jury is the sole judge of credibility and weight to be attached to the testimony of the witnesses" and "can draw reasonable inferences from the evidence so long as each inference is supported by the evidence produced at trial." *Stahmann*, 602 S.W.3d at 577. The jury is also "free to apply common sense, knowledge, and experience gained in the ordinary affairs of life in drawing reasonable inferences from the evidence." *Eustis v. State*, 191 S.W.3d 879, 884 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd). "When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of

the verdict and defer to that determination." *Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012) (citing *Jackson*, 443 U.S. at 326).

*Evidence of Identity*

Favata does not challenge the sufficiency of the evidence to support that a person committed aggravated assault against Steger and Nieuwoudt by shooting them with a firearm when they were at the bar on December 17. A person commits aggravated assault if the person intentionally, knowingly, or recklessly causes bodily injury to another, and the person uses or exhibits a deadly weapon during the assault. Tex. Penal Code §§ 22.01(a)(1), .02(a)(2); *see also id.* § 1.07(a)(17) (defining deadly weapon to include firearm). Favata challenges the legal sufficiency of the evidence to prove beyond a reasonable doubt his "identity as the shooter." He argues, "The State may have proven that somebody shot [Steger] and Nieuwoudt with a firearm, but the State did not prove that the shooter was [Favata]." He further argues, "At best, the State's evidence tends to prove that [he] was at [the bar] after midnight, and that he exited the bar around 1:00 a.m. (albeit unwillingly) along with others who attended the party and who also left [the bar] around the same time before the shooting."

As support for his position that the evidence was insufficient, Favata relies on the lack of direct evidence showing that he was the shooter and the inability of the witness who reported seeing the "muzzle flash" coming from the vehicle to "identify the gender [of the shooter] or the number of people in the car." He also explains the video recording of the vehicle parked at the restaurant shortly after the shooting as follows: "if someone drove the car downtown to pick up [Favata], there is nothing nefarious about parking in a nearby space while waiting for a call or text," which is what the "video portrays," and that "[e]ven if the car was

7

originally parked closer to [the bar], it is entirely conceivable that its occupants would drive away and park elsewhere upon hearing shots fired at [the bar]." He further argues that "the happenstance that the same car was seen parked at [his] house is not sufficient to prove beyond a reasonable doubt that [he] was the shooter"; that there was no evidence or testimony that his vehicle had "gunshot residue in the center console storage compartment"; that the evidence showed that other individuals were ejected from the bar; and that one of the State's own witnesses "negated the possibility that [he] was driving that vehicle on the night of the offense." Favata argues that a witness's testimony placed him downtown "at least an hour before he was kicked out of [the bar] around 1:00 a.m.," that other evidence showed that his vehicle was being driven on Interstate 35 at 12:45 a.m. on November 17, and that "[n]o rational juror could have placed [him] both in the car and at the bar at the same time."

"Identity may be proven by direct evidence, circumstantial evidence, or by reasonable inferences from the evidence." *Ingerson v. State*, 559 S.W.3d 501, 509 (Tex. Crim. App. 2018) (citing *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009)). Further, in viewing the evidence, we must consider the "combined and cumulative force of the evidence" and view the evidence in the light most favorable to the jury's guilty verdict. *See Merritt*, 368 S.W.3d at 526; *see also Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018) (explaining that "jury may accept one version of the facts and reject another, and it may reject any part of a witness's testimony" and that appellate courts "presume that the factfinder resolved any conflicting inferences from the evidence in favor of the verdict" and "defer to that resolution"). And a certain type of evidence is not required when other evidence connects the defendant to the crime. *See Johnson v. State*, 176 S.W.3d 74, 77–78 (Tex. App.—Houston [1st

8

Dist.] 2004, pet. ref'd) (stating that lack of physical or forensic evidence was factor for jury to consider in weighing evidence but holding that evidence was sufficient to sustain conviction).

In this case, the video recording shows a man being kicked out of the bar shortly before the gunshots were fired,[9] the bouncer identified the man as Favata in a photographic line-up a few weeks after the shooting and at trial, and a detective testified that the location where the vehicle registered to Favata was driving at approximately 12:45 a.m. was less than five minutes from the downtown area. Crediting this evidence, the jury could have reasonably inferred that Favata had time to park the vehicle across the street from the bar and enter the bar before being seen around 1:00 a.m. The evidence also showed that the gunshots were fired from a silver SUV with blacked-out windows and black rims across the street from the bar and that the vehicle registered to Favata matched the description of the vehicle from which the shots were fired.[10] The jury also was able to view the images and video of the man in the vehicle registered to Favata parked in the nearby restaurant's parking lot shortly after the shooting. The still shots show the vehicle's license plate number—the same license plate number of the vehicle registered to Favata—and the video shows the vehicle parking, the driver appearing to remove and replace the magazine of a handgun and then placing it in the forward console's area, and a few minutes later, the vehicle driving away. The jury also could have considered the DNA evidence

---

[9] Although there was conflicting evidence about the timeline of events, with some witnesses testifying that it was ten to fifteen minutes between the man being kicked out of the bar and the shooting, the video recording shows that the shooting occurred within approximately one minute of the hat being thrown out of the bar.

[10] Favata asserts that "[t]here was no testimony presented to prove that [he] is the registered owner of the [suspect vehicle]," although he states that the State presented "definitive proof" that he was the registered owner of the vehicle being driven on Interstate 35. The license plate for the vehicle registered to him was shown in the still images from the video recording from the parking lot of the nearby restaurant, and the exhibits included photographs of the vehicle in front of his residence and a photograph of the vehicle posted on his Facebook page.

connecting Favata to the hat that belonged to the man who was kicked out of the bar shortly before the shooting, the evidence that the hat's logo was from a company at which Favata had worked, and the evidence that the police found an empty pistol holster at Favata's house.

As to the witness who testified that "sometime after midnight," he noticed that the man who earlier had attempted to enter the bar was "sitting at the bar," the witness's "guess [was] he had come up from the back door" and estimated that "more than probably an hour" had passed between "the first initial interaction versus the second." But the witness also testified that he was "guessing" that the second encounter was "sometime after midnight" and that he had "no idea" of the "specific timeframes, at this point, this many years later." Particularly given this testimony, the jury could have discounted the witness's testimony about timing. *See Romano v. State*, 610 S.W.3d 30, 34 (Tex. Crim. App. 2020) (stating that factfinder "may find credible all, some, or none of the testimony that the witnesses give"). Regardless, to the extent that the witness's testimony conflicts with the jury's verdicts, we resolve the conflict in favor of the latter. *See Merritt*, 368 S.W.3d at 525–26.

Viewing the evidence under the applicable standard of review, we conclude that it was legally sufficient to establish Favata's identity as the person who committed the aggravated assaults against Steger and Nieuwoudt. *See Jackson*, 443 U.S. at 319; *Stahmann*, 602 S.W.3d at 577. Thus, we conclude that the evidence was legally sufficient to support his convictions and overrule his sole issue on appeal.

## CONCLUSION

Having overruled Favata's sole issue, we affirm the trial court's judgments of conviction.

10

_____

Rosa Lopez Theofanis, Justice

Before Justices Baker, Smith, and Theofanis

Affirmed

Filed:   August 23, 2024

Do Not Publish